HARDY v. GRAY et al.  POWERS et al. v. SAME.  In re ANDREWS.

(Circuit Court of Appeals, First Circuit.  February 21, 1906.)

Nos. 592, 593.

1. BANKRUPTCY—PROVABLE DEBTS—SURRENDER OF REFERENCE.

To render a preference voidable under Bankr. Act July 1, 1898, c. 541, § 60b, 30 Stat. 562 [U. S. Comp. St. 1901, p. 3445], and therefore one which must be surrendered by the creditor receiving it before proving his claim under section 57g (30 Stat. 560 [U. S. Comp. St. 1901, p. 3443]) as amended by section 12, Act Feb. 5, 1903, c. 487, 32 Stat. 799 [U. S. Comp. St. Supp. 1905, p. 688]), there must have been an actual intention on the part of the debtor to give a preference, and such intention cannot be presumed from the fact alone that he knew himself to be insolvent.  Without the existence of such intention in fact a creditor cannot be said to have had reasonable cause to believe that a preference was intended, which is also essential to the requirement that it shall be surrendered.

2. SAME.

Facts considered in relation to a payment made by an insolvent to a creditor by 'a return of goods and *held* to show a common purpose to make a colorable showing of a belief in the debtor's solvency, without making such examination as would have disclosed the truth, which charged both debtor and creditor as with knowledge that the result of the transaction would be to give the creditor a preference, and rendered the preference one which must be surrendered before the creditor could prove his claim.

3. SAME.

A creditor who indirectly repurchased goods from a debtor who was insolvent and sold the same again at a loss of 30 per cent., *held* to be assumed to have had reasonable cause to believe that a preference was intended, as it in fact was.

For opinion below, see 135 Fed. 599.

Lee M. Friedman (Morse & Friedman, on the brief), for appellants.
Alexander Whiteside (Burton P. Gray and Percy D. Atherton, on the brief), for appellees.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

PUTNAM, Circuit Judge.  These two cases are appeals from the District Court for the District of Massachusetts, sitting in bankruptcy, disallowing two claims offered in proof, on the ground that preferences had been received by the two creditors which had not been returned.  The referee allowed the claims, and the court reversed the referee.  One of the creditors, now appellants, is Horace C. Hardy, and the other is the copartnership of Powers & Mayer, each residing in the city of New York, and having his business establishment there.  The bankrupt is Frank A. Andrews, residing, and who did business as a jeweler, in the city of Boston.  The provision of the statute immediately involved is subdivision "g" of section 57 of the bankruptcy law of July 1, 1898 (30 Stat. 560, c. 541 [U. S. Comp. St. 1901, p. 3443]) amended by section 12 of the act of February 5, 1903 (32 Stat. 799, c. 487 [U. S. Comp. St. Supp. 1905, p. 688]), so as to read as follows:

"The claims of creditors who have received preferences, voidable under section sixty, subdivision b, or to whom conveyances, transfers, assignments, or incumbrances, void or voidable under section sixty-seven, subdivision e, have been made or given, shall not be allowed unless such creditors shall surrender such preferences, conveyances, transfers, assignments, or incumbrances."

Subdivision "g," before it was amended, read as follows:

"The claims of creditors who receive preferences shall not be allowed unless such creditors shall surrender their preferences."

The pith of the amendment so far as concerns these appeals, is the reference to section 60, subd. "b" (30 Stat. 562 [U. S. Comp. St. 1901, p. 3445]), as follows:

"If a bankrupt shall have given a preference within four months before the filing of a petition, or after the filing of the petition and before the adjudication, and the person receiving it, or to be benefited thereby, or his agent acting therein, shall have had reasonable cause to believe that it was intended thereby to give a preference, it shall be voidable by the trustee, and he may recover the property or its value from such person."

Prior to this amendment, this subdivision was regarded as broad enough to include a preference according to subdivision "a" of section 60 of the same act, as construed in Pirie v. Chicago Title & Trust Company, 182 U. S. 438, 21 Sup. Ct. 906, 45 L. Ed. 1171. There the broad distinction was made between subdivisions "a" and "b" of section 60, so that it was stated at pages 446 and 447 of 182 U. S., pages 910, 911, of 21 Sup. Ct. (45 L. Ed. 1171) that, under subdivision "b," a transfer from the bankrupt may be avoided by the trustee, subject, however, to the limitation, among others, that the creditor had reason to believe that a preference was intended, while it was held at pages 451 of 182 U. S., page 911, of 21 Sup. Ct. (45 L. Ed. 1171) and sequence that, under subdivision "a," the intent is not material. Consequently, four judges dissenting, such a construction was given subdivision "a" that, in connection with subdivision "g" of section 57, as it stood before it was amended by the act of February 5, 1903, the claim of a creditor who had received a transfer from an insolvent person who afterwards became bankrupt, could not be proved without first surrendering what was received by the transfer, provided the transfer operated, as a matter of fact, to give him a greater percentage than other creditors of the same class might ultimately receive, and this without regard to the actual intention of the parties. When, however, subdivision "g" of section 57 of the act of 1898 was, by the amendment of 1903, limited to the circumstances of subdivision "b" of section 60, the expressions contained in the opinion in Pirie v. Chicago Title & Trust Company, 182 U. S. at pages 446 and 447, 21 Sup. Ct. at pages 910, 911, 45 L. Ed. 1171, applied to the extent of making it one of the conditions to the barring of a creditor from proving his claim that he "had reason to believe that a preference was intended." Thus, as the statutes now stand, so far as concerns any alleged preferences involved in these appeals, all artificiality has disappeared, and the word preference, as well as the word intended, may be read with their natural meaning, subject, of course, to the general

rules by virtue of which, under certain circumstances, an act from which a result ensues may sometimes be held to contemplate and purpose the result.

We must, however, call attention to the fact that the act of 1898 has given an artificial meaning to the word "insolvent," thereby complicating very much the construction of the statutes as applied to alleged preferences, and rendering to a large extent inapplicable the decisions of courts of authority on statutes where the word insolvency is to be read in its ordinary business sense. What we refer to is paragraph 15 of section 1 (30 Stat. 544 [U. S. Comp. St. 1901, p. 3418]) as follows:

"A person shall be deemed insolvent within the provisions of this act whenever the aggregate of his property, exclusive of any property which he may have conveyed, transferred, concealed or removed, or permitted to be concealed or removed, with intent to defraud, hinder or delay his creditors, shall not, at a fair valuation, be sufficient in amount to pay his debts."

This has established so artificial a rule that the usual indicia by virtue of which a man is regarded as insolvent, and, consequently, by virtue of which a creditor may be said to have reason to believe that he is insolvent, or the reverse, become, to a very large extent, of no importance. This fact was illustrated by In re Pettingill & Co. (D. C.) 135 Fed. 218, a case which came before us incidentally under the same title in (C. C. A.) 137 Fed. 840. There, marked and numerous indications of insolvency in the natural business sense of the word existed, but it was justly said that "grounds for reasonable belief in a present inability to pay debts in the course of business are not necessarily grounds for believing that a man's property at a fair valuation is not sufficient to pay his debts."

The learned judge of the District Court found in the pending cases that the bankrupt was in fact insolvent within the meaning of the existing statutes at the time of the alleged preferences in question. We do not understand that this is disputed. He also found that the debtor knew that he was insolvent. This is disputed. Evidently he also found that the creditors had reasonable cause to believe that the debtor was insolvent. Then he proceeded:

"If the debtor is insolvent, he intends preference by any payment of a preexisting debt. If the creditor has reasonable cause to believe that the debtor is insolvent, then the creditor has reasonable cause to believe that a preference is intended. Under the circumstances here presented, the court has to determine only if these two creditors severally had reason to believe the bankrupt was insolvent at the time the payments were made to them by him. If the question is answered in the affirmative as to either, that creditor must surrender his preference."

It appears to us that, by this, the learned judge eliminated the element of actual intention on the part of the debtor to give a preference. In other words, the rule laid down is apparently that, so long as the debtor is insolvent, and knows that he is insolvent, and makes a payment of a pre-existing debt, the intent to prefer is a presumption of law. Whatever may have been the meaning of the learned judge, we understand that on the whole, he held the view of the law which the trustees squarely took before us; that is to say, "that all that it

is necessary for them to prove is that Powers & Mayer and Hardy had reasonable cause to believe that Andrews was insolvent on the dates in question." Following this out, the trustees proceeded to argue at length against the proposition that, to prove a preference, it is necessary to show that the debtor actually intended to give one, and that the creditor had reasonable cause to believe that there was this actual intention.

Under subdivision "b" of section 60 of the act of 1898, adopted, as we have shown, by section 12 of the act of 1903, it can hardly be said that a creditor had reasonable cause to believe that a preference was intended until it is shown that there was such an intention on the part of the debtor. Let us first take its natural reading. We have shown that an element expressly contained therein is that the creditor "shall have had reasonable cause to believe that it was intended thereby to give a preference." Naturally and justly it would be said that no one could be charged with a reasonable cause to believe something unless the something existed to which the belief was supposed to relate. It is true that the ordinary rule that a person who does an act is supposed to contemplate what results therefrom, applies to cases of this class, but only as an element; and it cannot apply even as an element unless the party who does the act has a knowledge of the essential facts which tend to produce the resulting consequences, or at least has a reasonable cause to believe them, or purposely shuts his eyes. Therefore the question is whether the authorities support the position taken by the trustees, as we have explained it, notwithstanding the natural reading of the statute as amended in 1903 is as we have said it to be.

Notwithstanding the view taken in some directions that the bankruptcy statute of 1898 is to be regarded as a new Code, the interpretation of which is to be influenced but little, if at all, by pre-existing legislation, to shut our eyes to the history of such legislation, and to the interpretation put on previous statutes, would be a very extreme thing to do; and, certainly, since Wilson v. Nelson, 183 U. S. 191, 194, 22 Sup. Ct. 74, 46 L. Ed. 147, and sequence, this is not permitted. Under the act of 1867, the intention to prefer was expressed in the same language whether it related to an act of bankruptcy or to a revocable transaction between a debtor and a creditor giving advantage to the latter, or to an application for the bankrupt's discharge. As it is impossible to hold that a bankrupt should be refused his discharge where he was, in fact, innocent of any actual, wrongful intent, so the actual intent was necessarily involved in each of the three particulars referred to. Some expressions in Toof v. Martin, 13 Wall. 40, 20 L. Ed. 481, and elsewhere, might seem to support the position of the trustees on these appeals. These expressions, however, are more than met in the later cases of Wilson v. City Bank, 17 Wall. 473, 21 L. Ed. 723, Grant v. National Bank, 97 U. S. 80, 24 L. Ed. 971; Barbour v. Priest, 103 U. S. 293, 26 L. Ed. 478, and Stucky v. Masonic Savings Bank, 108 U. S. 74, 2 Sup. Ct. 219, 27 L. Ed. 640; in the last two of which cases Grant v. National Bank was cited and approved, and even its expressions persisted in. In

Wilson v. City Bank, 17 Wall. at page 486, (21 L. Ed. 723) the following occurs:

"Many find themselves with ample means, good credit, large business, technically insolvent; that is,. unable to meet their current obligations as fast as they mature. But by forbearance of creditors, by meeting only such debts as are pressed, and even by the submission of some of their property to be seized on execution, they are finally able to pay all, and to save their commercial character and much of their property. If creditors are not satisfied with this, and the parties have committed an act of bankruptcy, any creditor can institute proceedings in a bankrupt court. But until this is done, their honest struggle to meet their debts and to avoid the breaking up of all their business is not, of itself, to be construed into an act of bankruptcy, or a fraud upon the act."

In Grant v. National Bank it was said, at page 81, 97 U. S. (24 L. Ed. 971), as a proposition of importance in discussing the question of preference, etc.:

"The debtor is often buoyed up by the hope of being able to get through with his difficulties long after his case is in fact desperate; and his creditors, if they know anything of his embarrassment, either participate in the same feeling, or at least are willing to think that there is a possibility of his succeeding."

In Barbour v. Priest, 103 U. S. at page 296 (26 L. Ed. 478) referring to a creditor who gets security for his debts, it was said:

"Such person must have reasonable cause to believe that the grantor in the conveyance was insolvent at the time it was executed, and that it was made with intention to defeat the bankrupt law. Both these must exist as facts which the grantee had reasonable cause to believe."

These propositions establish that the intent to prefer under the act of 1867 was held to be an actual intent, and not an attributed one. We find no change in the decisions with reference to the present statute. We do not undertake to discuss the cases cited to us which are not authoritative. Barring those, all that remain are Pirie v. Chicago Title & Trust Company, 182 U. S. 438, 21 Sup. Ct. 906, 45 L. Ed. 1171, Western Tie & Timber Company v. Brown, 196 U. S. 502, 25 Sup. Ct. 339, 49 L. Ed. 571, the same case decided by the Court of Appeals in 129 Fed. 728, 64 C. C. A. 256, Wetstein v. Franciscus, 133 Fed. 900, 67 C. C. A. 62, and In re Eggert, 102 Fed. 735, 43 C. C. A. 1. In the last case the Court of Appeals for the Seventh Circuit, after some discussion of the authorities, merely concluded that, as a matter of law, the circumstances did not charge the creditors with sufficient knowledge to hold them with having accepted a preference. So in Wetstein v. Franciscus the Court of Appeals for the Second Circuit merely held that there was sufficient to go to the jury on the issue whether the parties sought to be charged had reasonable cause to believe that it was intended to give a preference. There it was admitted that the insolvent, after payment to the preferred creditor, still owed unsecured claims to the amount of $20,000, without any assets applicable thereon. To understand Western Tie & Timber Company v. Brown, it is necessary to examine the case as it appeared in the Court of Appeals as well as in the Supreme Court. The ques-

tion involved was one of set-off, and not of preference. We think, so far as the appeals before us are concerned, the only expressions of the Supreme Court under the present statutes are those in Pirie v. Chicago Title & Trust Company, 182 U. S. 446, 447, 21 Sup. Ct. 906, 45 L. Ed. 1171, already referred to, which emphatically declare that the subdivision of the statute of 1898, already quoted, adopted by the section of the act of 1903, involves the element that the "creditor had reason to believe a preference was intended," which could not exist unless, in fact, a preference was actually intended on the part of the debtor, or unless there existed what the law regards as the equivalent thereof.

We are now prepared for an examination of the facts. The bankrupt was a retail jeweler at Boston, having been in trade as such about eight years. He commenced with a capital of about $300; and, from the very beginning, he had continuously purchased goods of Powers & Mayer, the larger of the two creditors involved in these proceedings. His relations with Hardy continued about two years; and Hardy testified that, when he first called on him, he made inquiries about his business, was impressed with his taste and skill, and sold him a bill of about $5,000. Andrews' relations with Powers & Mayer were always those of a man of small capital, being continuously assisted by them in taking care of his notes which he gave them. Hardy sold him goods on credit for something over a year, and then wrote him that, whenever he wanted goods, he would send them to him, but when he made sales he must pay cash at the time of the sales. As his notes to Hardy came due, he paid varying amounts, from one-half the note to $100 or $200. Hardy testified that when he commenced business with Andrews, he did not expect him to pay his notes as they came due, but "at least half of every note, and more if he could." Through all Andrews' transactions with both creditors, he was being carried along by them like a man of small means, thought to be doing a good business and increasing his capital, with the expectation that by his taste and ability as a retailer, he would work out in the end. Therefore, under the circumstances, the irregularities in his payments were regarded, both by him and the creditors in question, as not very significant. The circumstances in this respect seem to have been very much like those of Grant v. National Bank, already cited, where more persuasive facts than those which appear here were held not to bring the case within those provisions of the then bankruptcy statutes which denounced preferences.

There were other circumstances pro and con, and some irregularities, which the view we take of these cases makes it unnecessary to dwell on. Clearly the irregularities were not regarded by the creditors themselves as very important; and, except for the particular facts to which we will call attention, the transactions in issue before us were not inconsistent with an honest intention of reducing the debtor's stock, which was very large, and correspondingly reducing his liabilities, so as to enable him to go on, with a hope of meeting his payments better in the future than he had in the past. The transactions were completed in an indirect manner, which, on the one

hand, suggests concealment, often a badge of intended wrongdoing, and, on the other hand, a mere desire to avoid unnecessarily injuring Andrews' credit, contemplating that he would continue his business. The transactions were out of the ordinary course of the business of the debtor, and, therefore, under prior statutes, prima facie invalid; but, under the present legislation, they were, perhaps, as consistent with the purpose we have suggested, that of honestly reducing assets and liabilities, as with any unlawful intention. On the whole, and in view especially of the difficulty of proving the elements which the present statutes require to be proved to establish an unlawful preference, in connection with the peculiar definition they give to insolvency, it might well be said, except for the particular facts referred to, that Andrews neither knew that he was insolvent nor intended a preference.

The transactions between Powers & Mayer and Andrews which are questioned, occurred between September 10, 1903, and September 12, 1903. Those with Hardy occurred October 5, 1903. Andrews finally collapsed on October 12, 1903, making that day an assignment to his creditors; and a petition in bankruptcy was filed on November 16, 1903. On September 10, 1903, he owed Powers & Mayer approximately $11,326. By the transactions involved on this appeal, he paid in cash on that indebtedness $1,200, and surrendered to Powers & Mayer, towards the same, goods accepted at a value of $7,622, most or all of them goods which he had purchased from them. On October 5, he owed Hardy approximately $3,695.76. He paid him $1,517.66 in an indirect manner, mainly by goods which he had purchased of him. The balance remaining due to Powers & Mayer was $2,504, and that to Hardy $2,178.10, the proofs of which are now in dispute. By the transactions in question it would appear that Andrews reduced his stock by the amount of $10,339.66, and his assets by the same amount. His liabilities at the time of the transactions with Powers & Mayer are claimed to have been estimated at $31,500, and his assets at $33,500. The liabilities, as shown by the proceedings in bankruptcy, were considerably larger, and the assets very much smaller. Making allowance for the apparent reduction of liabilities through the transactions involved in the controversies here, they were at least $15,000 more than as estimated between Mayer and Andrews in the manner which we will describe. That the assets apparently shrunk on the valuation in bankruptcy we do not regard as a fact on which we can rely.

It will be noticed, however, that the transactions with Powers & Mayer between September 10th and 12th involved a very considerable sum, so that it might well have been expected that both parties would have proceeded with care in regard thereto. Mayer, of Powers & Mayer, called on Andrews in reference to their mutual relations on September 10th. Immediately thereafter Mayer conferred with his counsel, who told him that, if Andrews could show him that he was solvent, he might accept goods from Andrews, adding: "If, on the other hand, you find that he is insolvent, keep your hands off." Thereupon, Mayer went back to Andrews and asked him for a state-

ment. Mayer testified that there were many books and things to go through, and figuring to do, leaving the inevitable impression that Andrews had on hand no proper showing of his financial condition. He testified further that he found Andrews' assets in excess of his liabilities, this, we understand, in accordance with the figures we have given; but he said to Andrews: "Well, I cannot stay long; I am taking the 5 o'clock train." The result is, as the record shows, that, in view of the very considerable amount involved between Mayer and Andrews, the examination of assets and liabilities was superficial and hasty. It is true that this might have happened through carelessness, and it might have been because the only purpose the parties had was to comply colorably with the advice which Mayer had received from his counsel, and thus make out some kind of a case in harmony therewith; yet any court would be justified in finding that the latter was the fact, as it must be assumed that Andrews was informed by Mayer of the advice which he had thus received, and, therefore, shared in Mayer's purposes, whatever they were. The common intention, however, is made entirely clear by Andrews' letter to Powers & Mayer of September 10th, and the reply written from New York on September 11th.

The first was as follows:

"Boston, Sept. 10th, 1903.

"Messrs. Power & Mayer, New York—Dear Sirs: I notice there is a large note of $1052.22 coming due on the 25th of September and I find I will have a very hard time paying even part of it owing to the dull condition of trade in Boston just now. I assure you that you need not worry on your end of it because I am perfectly solvent to take care of it, only I haven't the ready money.

I wish to advise you of the fact that my assets amount to about $33,500, and my liabilities to about $31,500, so you see I could take care of it if business was in better shape. However, I feel that I would like to reduce your account very much, and I would consider it a favor if you would accept some of the goods which you sold me and credit my account with same; it will relieve me very much of the anxiety of owing you so much money.

I sincerely trust that this will meet with your approval, and with kindest regards, I am

"Yours truly, Frank A. Andrews."

The second was as follows:

"New York, Sept. 11th, 1903.

"Mr. F. A. Andrews, Boston, Mass.—Dear Sir: In reply to your favor of the 10th inst., saying that it will be very hard for you to meet payment of the note due on the 25th of this month, beg to say, do whatever you can and whatever assistance you need, we will give you.

"We notice what you say in reference to returning goods, as your account with us seems to frighten you. We notice the statement you make in this letter and find that you are perfectly solvent and need not be afraid, but if you think best to reduce your account, you may send back whatever you think best and we will apply it on your account. Notwithstanding, we have the fullest confidence in your ability in every possible way.

"Kindest regards.

"Yours very truly, Powers & Mayer."

It needs no explanation from us to show that these letters were written by a common understanding, containing statements so dovetailed together that it is plain that the only purpose could have been

144 F.—59

to put on record a case to correspond with the advice Mayer received from his counsel. Almost every line leads to this conclusion, beginning with the peculiar way in which Andrews refers to the note coming due on the 25th of September, as though he was first calling it to Mayer's attention, although it must have been talked over that same day at Boston. Coupled with this was the absolute assurance of solvency on the part of Andrews, and the corresponding absolute assurance on the part of Powers & Mayer that they had the fullest confidence in Andrews' ability "in every possible way," each of which must have been purposely exaggerated, or wholly feigned. We thus have a transaction of very considerable importance, done after the advice requiring care from counsel known to be experienced and sound, but done with such haste as suggests a colorable compliance with the advice received, followed up by correspondence which expressed a confidence which could not have existed, and which was consistent only with a purpose to make a case. When parties who have been thus cautioned make a colorable showing on the face of such a correspondence as we have here, the conclusion cannot be avoided that there was a common purpose, which involved the willful shutting of eyes against what a careful investigation would have developed, thus, on the plain and emphatic rules of law, charging the parties with a knowledge of the facts as they in truth existed. Bishop's New Criminal Law (1892) § 302. Under these circumstances, however much or little Andrews and Mayer knew, they are chargeable with the same consequences as though they understood the facts. This results in the proposition that both Andrews and Mayer are to be held as though they knew that Andrews was insolvent in the sense of the statute, and that the result of the transaction was to give Mayer an advantage, so that both parties intended that result.

The circumstances about Hardy are different from those relating to Powers & Mayer. In some respects the incidental facts are more favorable to Hardy, and in some respects less so. We have said that the transaction with him was on October 5th. Hardy testified that he had so far believed that Andrews would go on with his business that, on the same day, he took an order for $2,000 worth of diamonds to be shipped to Andrews on memorandum, which Andrews told him he felt he could sell, and which Hardy immediately forwarded. Also on September 5th, Andrews wrote him inclosing a note of $1,000 in part renewal of a note of $1,261.34, which Hardy accepted. In a letter accompanying the note Andrews said that his business was commencing to show decided signs of improvement, and that he felt he would have his share in the fall. On the other hand, Hardy testified that on the 5th of October he thought that if he came to Boston and pressed Andrews to pay for some memorandum goods which he had shipped him, but which had not been paid for, Andrews would comply. Two notes which Andrews owed him were then coming due immediately, on which Andrews told him at the interview he could not pay more than $100. Hardy testified that he was not satisfied with that, and that he said to Andrews that he wished to have the account for the memorandum goods settled

up. The result was that he got nothing for the memorandum goods, and indirectly purchased of Andrews goods to the amount of $1,475, for which he paid him. This was with the understanding between Hardy and Andrews that Andrews would apply the money thus paid him towards taking up the two notes held by Hardy the maturity of which was at hand, as we have said. Therefore, with the aid of this money, Andrews did take up those notes, amounting to $1,517.66, being about two-fifths of Hardy's entire claim. Of course, in the eyes of the law, this indirection of proceeding is an immaterial fact. The crucial thing, however, is that Hardy testified that the goods for which he allowed Andrews $1,475, he sold for about $1,000. Of course, Hardy would not have submitted to this loss of about 30 per cent., thus discounting in fact about 30 per cent. of Andrews' notes, if he had had a reasonable belief that Andrews' assets would ultimately pay his liabilities. The difficulty is to reconcile his submisson to this loss with any belief on the part of Hardy that Andrews was solvent in any sense of the word, either statutory or of a business character. We must conclude that he knew he was engaged in a hazardous transaction, and that he did not care to open his eyes to the consequences. So far as the intention on the part of Andrews is concerned, we have no way of dealing with what we have said he was shutting his eyes to in regard to his transaction with Powers & Mayer, except to charge him with a continuance of the implied knowledge and intention with which he is chargeable in connection with that transaction. Each of them took the chances of violating the statute and must be content to abide the consequences.

There always remains the fact that is not easy to explain why Andrews should give a preference to either of the parties who have appealed to us. If he expected not to go on with his business successfully, there could be no substantial reason why he should have desired to give either of them an advantage over the rest of his creditors. The more assets he had retained the greater the probability of his making a satisfactory adjustment with his creditors, and afterwards going on with his business. At any rate, we are unable to see what he gained, or could expect to gain, by giving a preference to either of the parties involved. However, it is not always easy nor necessary to determine fully the motives which operate on debtors under circumstances like those at bar. They cannot in this instance be explained with certainty on the ground of friendship, or on the ground of a certain degree of gratitude for the leniency which Andrews had before received. What occurred resulted probably from a lack of persistency on the part of Andrews in resisting what was asked of him. The reasonable interpretation is to attribute what Andrews did to that fact alone; but, however this may be, and even though we could not explain the motives which governed the parties, we are unable to shut our eyes to the crucial features which lead us to our conclusions.

We cannot close without calling attention to the form of the decrees appealed from. The referee in each case allowed the proof of claim, and the only order, or judgment, entered in the District Court

on appeal from him was as follows: "It is hereby ordered and decreed that the judgment of the referee be, and hereby is, reversed." No determination was ever made of the amounts to be surrendered before the proofs of claims could be allowed, whether for the nominal amounts of the goods received by them or for the amounts realized from them, or how the adjustments should be made. Perhaps all this was required to make a final appealable disposition in the District Court of the issues involved. At some time the question may come before us whether orders, or judgments, like these, entered under circumstances like these, can be regarded as so far final as to be appealable. We do not feel called on to anticipate any difficulty of that character. We should observe, however, that, as we understand the record, the cases remain open for the adjustment of these details in the District Court. In each the judgment is:

The decree of the District Court is affirmed, and the appellees recover their costs of appeal.