In re THE LEADER (PLUNKETT–JARRELL–McREA GROCER CO.,
Intervener).

(District Court, W. D. Arkansas, Texarkana Division. September 28, 1911.)

1. BANKRUPTCY (§ 140*)—PROPERTY VESTING IN TRUSTEE—EQUITABLE ASSIGNMENT.

An order executed by the insolvent prior to bankruptcy, directing insurance agents, who had only authority to solicit insurance, deliver policies, and collect premiums, to pay over to a creditor a part of the proceeds of an insurance loss due to the insolvent, no part of which ever came into the hands of such agents, without notice to the insurers, was not valid as an equitable assignment of a part of the fund as against the insolvent's receiver or trustee in bankruptcy; the equity of the receiver or trustee being at least equal to that of the creditor.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.*]

2. BANKRUPTCY (§ 140*)—ASSIGNMENTS—INSURANCE LOSS—ORDER TO CREDITOR.

Insolvent, having suffered an insurance loss, assigned the policies to a dry goods company, and then gave an order on the insurance agents, who only had authority to solicit insurance, deliver policies, and collect premiums, directing them to pay intervener a certain sum out of the insurance money when received. The agents gave a receipt for the order, and the loss was subsequently paid by checks sent to the agents, payable to the insured and the assignee of the policies jointly. Held, that under

such circumstances the checks, when received by the agents, were not subject to the order.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.*]

3. BANKRUPTCY (§ 164*)—PREFERENCES—ORDER TO PAY MONEY.

A partnership, after suffering a fire loss, was insolvent and assigned its policies of insurance to a dry goods company, to which it was indebted. Thereafter and within four months prior to bankruptcy, intervener, another creditor, having reasonable cause to believe that the partnership was insolvent, procured an order from the partnership on the insurance agents for payment of its account out of the insurance money. *Held*, that such order constituted a preference and was not valid as against the firm's trustee in bankruptcy.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 267; Dec. Dig. § 164.*]

4. BANKRUPTCY (§ 166*)—PREFERENCES—INSOLVENCY—NOTICE.

Absolute knowledge of insolvency by a creditor alleged to have been preferred is not required to justify a vacation of the transfer as a preference; the creditor only being required to have reasonable cause to believe that the debtor was insolvent and that a preference was intended.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250–258; Dec. Dig. § 166.*]

5. BANKRUPTCY (§ 303*)—PREFERENCE—INTENT OF DEBTOR—EVIDENCE.

Evidence *held* sufficient to show that the bankrupt, at the time of making transfer of insurance money to a creditor, intended a preference.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 303.*]

In the matter of bankruptcy proceedings of The Leader. On petition to review an order denying the validity of an alleged equitable assignment in favor of the Plunkett-Jarrell-McRea Grocer Company, intervener. Affirmed.

Frank S. Quinn and D. W. McMillan, for intervener.
William H. Arnold, for trustee.

YOUMANS, District Judge. John W. Sims, Clark Sims, and Van B. Sims, as partners, did a general mercantile business at De Queen, Ark., under the name of "The Leader." The business was begun in January, 1910. Van B. Sims was the manager and had entire control. On September 1, 1910, the stock of goods of the partnership was totally destroyed by fire. The value of the stock, according to the testimony of Van B. Sims, was nearly $13,000. It was insured for $7,-000, by seven policies of insurance of $1,000 each. September 20, 1910, Van B. Sims assigned the seven policies, in the name of The Leader, to the Smith-McCord-Townsend Dry Goods Company. He testified that he assigned them for collection. At the time The Leader was indebted to the dry goods company in a sum between $3,000 and $4,000. On October 4, 1911, Van B. Sims delivered to T. M. Anderson, agent for Plunkett-Jarrell-McRea Grocer Company, an order reading as follows:

De Queen, Ark., Oct. 4, 1910.

McCown & Mallory, Agts.—Gentlemen: Please pay to the Plunkett-Jarrell-McRea Gro. Co., or its agents, five hundred ninety-three and $\frac{10}{100}$ ($593.10) dollars out of my insurance money when it is received, and oblige,

Yours, The Leader, Van B. Sims, Mgr.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

190 F.—40

McCown & Mallory, to whom the order was directed, were agents of some of the insurance companies which had issued policies of insurance on the stock of The Leader. A receipt was given by them to Anderson, reading as follows:

De Queen, Ark., Oct. 4, 1910.

Received of T. M. Anderson, order reading as follows:

De Queen, Ark., Oct. 4, 1910.

McCown & Mallory, Agts.—Gentlemen: Please pay to the Plunkett-Jarrell-McRea Gro. Co., or its agents, five hundred ninety-three and $10/100$ ($593.10) out of my insurance money when it is received, and oblige, 
Yours,                                   The Leader, Van B. Sims, Mgr.

An involuntary petition in bankruptcy against The Leader as a partnership was filed October 27, 1910. Within a few days thereafter Will Steel was appointed receiver of the partnership. On the 4th of January, 1911, he was elected trustee of the bankrupt estate. As shown by the schedules, the liabilities of the partnership amounted to $11,-410.60, and the assets to $9,002.43. The insurance was adjusted at $5,990.02, and the open accounts amounted to $3,012.41. These two items made up the total of the assets of the partnership. Checks for the amount of the insurance on two or three policies, payable to the order of The Leader and Smith-McCord-Townsend Dry Goods Company, were sent by the insurance companies to McCown & Mallory after the delivery to them of the order above referred to, and prior to the filing of the petition in bankruptcy. These checks amounted to more than the order. After the filing of the petition and the appointment of the receiver these checks were returned to the insurance companies. They had not been indorsed by either one of the payees. The dry goods company afterwards released its claim in favor of the receiver, and other checks payable to his order were made out and delivered to him by the insurance companies, and the proceeds are now in his hands as trustee. The Plunkett-Jarrell-McRea Grocer Company filed an intervention, alleging that the giving of the order constituted an equitable assignment, and that it had thereby a lien on the fund in the hands of the trustee. The trustee answered and denied that the order was an assignment; that it had any legal effect; and that, if it had, it was a preference and void under the bankrupt law. The claim of the intervener was referred to the standing master, with directions to take proof, make findings of fact and law, and report the same to the court. In accordance with such order the master took testimony and made and filed his report, in which he finds, in substance, that the order was not an equitable assignment, and that the intervener has by virtue thereof no lien on any part of the bankrupt estate. To these findings the intervener filed exceptions. This is a hearing on those exceptions. 

[1] The order was not drawn upon the insurance companies who were the debtors and holders of the fund. Notice to McCown & Mallory was not notice to them. McCown & Mallory were not general agents of the company. The testimony shows that their agency was limited to soliciting insurance, delivering policies, and collecting premiums. No part of the fund was ever in their hands. The testi-

mony does not disclose what directions were given by the insurance companies to McCown & Mallory with regard to the disposition of the checks. There is no testimony tending to show that the insurance companies ever had notice of the order in the hands of McCown & Mallory. In order to create an equitable assignment an acceptance by the debtor or fundholder is not necessary. Moore v. Robinson, 35 Ark. 293. But, in order that the assignment may be effective as against the receiver or trustee in bankruptcy, notice to the debtor or fundholder is necessary.

"An order, writing, or act, which makes an appropriation of a fund, amounts to an equitable assignment of the fund. The reason is that the fund being a matter not assignable at law, nor capable of manual possession, an appropriation of it is all that the nature of the case admits of, and therefore it is held good in a court of equity. As the assignee is generally entitled to all the remedies of the assignor, so he is subject to all the equities between the assignor and his debtor. But in order to perfect his title against the debtor it is indispensable that the assignee should immediately give notice of the assignment to the debtor, for otherwise a priority of right may be obtained by a subsequent assignee, or the debt may be discharged by a payment to the assignee before such notice." Spain v. Hamilton's Adm., 1 Wall. 604–624 (17 L. Ed. 619).

"An agreement to pay out of a particular fund, however clear in its terms, is not an equitable assignment; a covenant in the most solemn form has no greater effect. The phraseology employed is not material provided the intent to transfer is manifested. Such an intent and its execution are indispensable. The assignee must not retain any control over the fund—any authority to collect, or any power of revocation. If he do, it is fatal to the claim of the assignee. The transfer must be of such a character that the fundholder can safely pay, and is compellable to do so, though forbidden by the assignor. Where the transfer is of the character described, the fundholder is bound from the time of notice." Christmas v. Russell, 14 Wall. 69–84 (20 L. Ed. 762).

The equity of a receiver or trustee in bankruptcy to a fund in the hands of a debtor of the bankrupt is equal to the equity of a creditor of the bankrupt holding an order of which the debtor has no knowledge. Laclede Bank v. Schuler, 120 U. S. 511, 7 Sup. Ct. 644, 30 L. Ed. 704.

[2] It is contended by counsel for the intervener that, when the checks came in the office of McCown & Mallory, they at once became subject to this order. This cannot be true for a number of reasons:

(1) As to the disposal of the checks McCown & Mallory were bound by the directions of the insurance companies, and not by the order of Sims.

(2) The checks were not money, and could not be converted into money by McCown & Mallory.

(3) The checks were subject to the order of The Leader and Smith-McCord-Townsend Dry Goods Company, and not to the order of either one of the two separately.

(4) By reason of the fact that The Leader was named as a payee the disposition was still left in its control.

The master was right in holding that the order was not effective, and created no lien which could be enforced as against the trustee.

[3] But, even if the order were an equitable assignment of a part of the funds, it would in my opinion be void under section 60b of the

Bankruptcy Act July 1, 1898, c. 541, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445), as a preference made within four months before the filing of the petition; the agent of the intervener having had reasonable cause to believe that it was intended thereby to give a preference. The testimony clearly establishes the insolvency of the partnership at the time the order was given. To make the preference void under the bankruptcy act, it must appear: First, that the agent of the intervener knew that the partnership was insolvent at the time the payment was made; second, that he had reasonable cause to believe that a preference was intended by the making of the payment.

After a review of the decisions bearing on the law applicable to the points above stated, the court, in the case of In re Eggert, 4 Am. Bankr. Rep. 449, 102 Fed. 735, 43 C. C. A. 1, says:

"The resultant of all these decisions we take to be this: That the creditor is not to be charged with knowledge of his debtor's financial condition from mere nonpayment of his debts, or from circumstances which give rise to mere suspicion in his mind of possible insolvency; that it is not essential that the creditor should have actual knowledge of, or believe in, his debtor's insolvency, but that he should have reasonable cause to believe his debtor to be insolvent: that, if facts and circumstances with respect to the debtor's financial condition are brought home to him, such as would put an ordinarily prudent man upon inquiry, the creditor is chargeable with knowledge of the facts which such inquiry should reasonably be expected to disclose."

In the case of Coder v. McPherson, 18 Am. Bankr. Rep. 523, 152 Fed. 951, 82 C. C. A. 99, in an opinion delivered by Judge Sanborn, it was held:

"That notice of facts which would incite a man of ordinary prudence to an inquiry under similar circumstances is notice of all the facts which a reasonably diligent inquiry would disclose."

Anderson, the agent of the intervener, to whom the order was given, testified at the hearing before the master as follows:

"I met Van B. Sims, manager of The Leader, on the street, and asked him about his account with us, and he told me that he thought he would have plenty of money to pay everybody, and I asked him about giving us an order on the insurance company for what he owed us, and he said he would do it, and went over to the courthouse and made out an order to the insurance agents McCown & Mallory for the amount of our account."

On cross-examination, he stated that the goods had been sold by a Mr. McMichael, one of intervener's salesmen, who lived at De Queen, where the business of the bankrupt had been conducted; that McMichael had endeavored to collect the account, but had not done so because "the insurance money had not been paid." Anderson also stated that he did not know any other source of payment. It is clear that McMichael had full knowledge in regard to the bankrupt's condition, and that this information had been communicated to Anderson, and that he knew the following facts: First, that the entire stock of goods had been destroyed; second, that the partnership was no longer a going concern; third, that the insurance on the stock amounted to $7,000; fourth, that the value of the stock was considerably larger than the amount of the insurance; fifth, that the insurance had not yet been adjusted; sixth, that the liabilities amounted to more than $11,000.

Anderson could not fail to see that the aggregate of the property of the partnership was not sufficient to pay its debts. He knew, therefore, that the partnership was insolvent.

[4] Before one can be said to have "reasonable cause to believe that a preference was intended," it must appear that the creditor alleged to have been preferred had reasonable cause to believe that the debtor was insolvent at the time of the alleged preference. Absolute knowledge of insolvency is not required.

"All that is necessary in such cases is the possession by the creditor at the time of such information relative to the debtor's affairs as should lead a reasonably prudent person to conclude that the property of the debtor at a fair valuation would not be sufficient to pay his debts." In re Pfaffinger (D. C.) 18 Am. Bankr. Rep. 807, 154 Fed. 528.

Mere suspicion of insolvency is not sufficient. Grant v. National Bank, 97 U. S. 81, 24 L. Ed. 971.

But a creditor cannot entirely close his eyes and stop his ears in order to keep himself in ignorance. Payment in the ordinary course of business by a going concern is very much different from payment by a concern that has suspended business and is in course of liquidation. This difference is emphasized when the suspension has been caused by fire.

Anderson knew facts which forced upon him the conviction that the partnership was insolvent, and he could not avoid the belief that the payment of the order would constitute a preference. It is idle to declare a belief in opposition to an obvious fact. Dogmatic assertion cannot stand in the face of positive demonstration. The fact that the entire stock of goods of the partnership had been destroyed was in itself sufficient to put a reasonably prudent creditor on notice. Anderson knew there would at least be a loss amounting to the difference between the cash value of the goods destroyed, which was about $13,000, and the amount of the insurance, which was $7,000. He knew, as a result of the fire, that there was a depreciation of assets in the neighborhood of $6,000. He also knew that the loss had not been adjusted, and must have realized that it was within the probabilities that the amount collected would be less than $7,000, as it afterwards turned out.

[5] But it may be contended that, in order to constitute a preference, intent on the part of the debtor must unite with belief on the part of the creditor, as held by the Circuit Courts of Appeals for the First and Sixth Circuits (Hardy v. Gray, 16 Am. Bankr. Rep. 387, 144 Fed. 922, 75 C. C. A. 562: In re First National Bank of Louisville, 18 Am. Bankr. Rep. 766, 155 Fed. 100, 84 C. C. A. 16), still the facts in this case show the existence of such intent. On direct examination Van B. Sims testified as follows:

"Q. State whether or not at the time you gave this order it was your intention to create a preference in favor of the Plunkett-Jarrell-McRea Grocer Company? A. It was not my intention, and I informed whoever I gave it to that it was not my intention."

On cross-examination he testified as follows:

"Q. What is the reason that you did not know, approximately, the amount you owed? A. I did know.

"Q. Well, when this order was given to the Plunkett-Jarrell-McRea Grocer Company, did you know how much you owed? A. I did.

"Q. Did you owe at that time the amount shown by these schedules to which your attention has been called? A. I did.

"Q. Then how can you say that you did not know you were insolvent when you gave this order? A. Because I had a bunch of accounts to collect and the insurance had not been collected. I think I was to get $7,000 out of the insurance, and I intended to use all I collected in paying up those debts, even though I had to borrow money to do it.

"Q. Your schedule of liabilities shows $11,410.60, and if you counted your insurance at $7,000, and, adding that to your account of $3,012.41, your entire assets would be $10,012.41. You would still have been short over $1,000. Now, please tell me how you could calculate that you were solvent before this insurance was adjusted. A. Because I intended to pay out rather than have the business to go into bankruptcy. I intended working to do it, and informed all the creditors that I talked with to that effect.

"Q. You knew your assets were not sufficient to pay out? A. I did.

"Q. Did you intend to earn enough, added to your assets, to pay it out? A. I did.

* * * * * * * * * * * * * *

"Q. When Mr. Anderson presented this order to you, you say that you told him it was not your intention to give a preference, did you not? A. As well as I remember, I told him that.

"Q. What did you mean by a preference? A. I meant that I did not intend to pay one and let the others go unpaid.

"Q. How did the question of preference ever arise in your conversation with him? A. I don't know that it arose, but I told him that I intended paying all the accounts and would sign this order if he wanted, but I intended paying it even though I did not sign the order.

"Q. You expected to collect those policies yourself, did you not? A. I did.

"Q. You thought the checks were going to be sent to you, did you not? A. I did.

"Q. And it was your intention when the checks were sent to you to collect the money on them and pay the amount due to Plunkett-Jarrell-McRea Grocer Company? A. It was my intention to pay the amount due to every one I owed.

"Q. How did you expect McCown & Mallory to pay this order if they were not in possession of funds at some time to pay it? A. I did not expect them to pay it. I informed the person I gave the order to, and also Mr. McMillan at a later date, that I did not think it had any more value than a blank piece of paper."

Disregarding Sims' statement that he considered the order worthless, and assuming that he intended it to be paid, his testimony shows that he knew some creditors must wait until he had earned money with which to pay them. He seemed to think that his declaration of intention to apply his subsequent personal earnings to the payment of the debts remaining after exhausting the assets precluded the possibility of a preference. The determination to pay ones debts out of future accumulations after exhausting present means is honorable and commendable; but it adds nothing to existing assets. Sims knew that all creditors could not be paid in full. He was bound to know that, if he paid one in full, one had an advantage or preference over others. A man must be held to intend the inevitable consequences of his own act. The fact of a preference was apparent both to him and to Anderson.

It is therefore ordered that the exceptions of the intervener to the findings of the master be overruled, and that intervener's petition be dismissed.