DEBUS v. YATES.

(District Court, E. D. Kentucky. August 17, 1910.)

1. BANKRUPTCY (§ 166*)—VOIDABLE "PREFERENCE"—INTENTION OF DEBTOR.

To constitute a voidable preference by transfer under Bankr. Act July 1, 1898, c. 541, § 60b, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445), as amended by Act Feb. 5, 1903, c. 487, § 13, 32 Stat. 799 (U. S. Comp. St. Supp. 1909, p. 1315), the transfer must have been such as to create a "preference," as defined in section 60a, and have been made with an actual, and not an attributed, intent on the part of the debtor to give a preference, and the creditor must have had reasonable cause to believe such preference was intended. It is not sufficient to establish such actual intent on the part of the debtor that he was insolvent when the transfer was made or that a preference in fact resulted.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 166.*

For other definitions, see Words and Phrases, vol. 6, pp. 5498, 5499; vol. 8, p. 7759.]

2. BANKRUPTCY (§ 161*)—VOIDABLE PREFERENCE—RECORDABLE TRANSFERS.

The amendment of Bankr. Act July 1, 1898, c. 541, §§ 60a, 60b, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445), by Act Feb. 5, 1903, c. 487, § 13, 32 Stat. 799 (U. S. Comp. St. Supp. 1909, pp. 1314, 1315), by adding the provision that, "where the preference consists in a transfer, such period of four months shall not expire until four months after the date of the recording or registering of the transfer, if by law such recording or registering is required," has the effect of making recordable transfers, which were in fact preferential and so intended by both parties, voidable under subdivision "b," although they were made more than four months before the bankruptcy, where they were not recorded until within that time; but the transfer is still to be judged, in determining the question whether or not it constituted a voidable preference, as of the time when it was made, and not as though it first came into being at the time it was recorded, and unless when it was made the

---

debtor was insolvent and actually intended a preference, and the cred-itor then had reasonable cause to believe it was so intended, it is not voidable.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 161.*]

3. BANKRUPTCY (§ 303*)—VOIDABLE PREFERENCE—INTENTION TO GIVE PREF-ERENCE—EVIDENCE CONSIDERED.

Bankrupt was a man of large business affairs, both on his own ac-count and through three corporations, of which he was principal stock-holder and an officer; their aggregate business in one of the years just prior to the bankruptcy amounting to $300,000. At about that time he contracted to sell a lot for $1,500, accepting as part payment a note giv-en to the purchaser by one of his corporations and indorsed by him. For legitimate reasons the deed was not made until more than a year after the contract, and within four months prior to the bankruptcy. The sale was made at the instance of the purchaser who desired the lot and expected to pay cash for it; the application of the note toward the purchase price being at the suggestion of the bankrupt. At the time of the transfer the bankrupt and the corporations were all in fact in-solvent; but such condition had existed for some years, and during that time the bankrupt had kept the business of all going and had sub-stantially reduced their indebtedness. He testified that until 10 days before he filed his petition, when certain creditors began to crowd him, he expected to pay out in full, and circumstantial evidence tended to support the statement. No claim was made of any other transfer which was either fraudulent or preferential, and no reason existed why he should prefer the purchaser of the lot, who was not pressing for pay-ment. *Held* that, conceding that the bankrupt knew of the insolvency, the evidence was not sufficient to show that he intended a preference, or that the purchaser had reasonable cause to believe such preference was intended, so as to render the transfer voidable.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 303.*]

In Equity. Suit by Louis K. Debus, trustee in bankruptcy of Jay H. Northrup, against Frank H. Yates. Decree for defendant.

Maxwell & Ramsey and George B. Martin, for plaintiff.
Hager & Stewart and Simeon S. Willis, for defendant.

COCHRAN, District Judge. This cause is under submission for final decree. It is a suit brought by Louis K. Debus, trustee in bank-ruptcy of Jay H. Northrup, against Frank H. Yates, to recover a va-cant lot of ground in the city of Louisa, Lawrence county, Ky., as a voidable preference under section 60b of the bankrupt act. The lot fronts 78 feet 3 inches on Madison street, and is sometimes referred to as three lots, though it is all under one fence. The recovery is sought conditionally upon payment to Yates of the sum of $178.-31 and interest from October 24, 1906, or subject to a lien in his fa-vor therefor. The lot was transferred to him by the bankrupt and his wife July 28, 1906, by deed then executed and delivered, but not lodged for record by him until October 29, 1906. The petition in bankruptcy was filed November 17, 1906. The making of the trans-fer and its lodging for record, therefore, were both within four months before the filing of the petition.

At the time of the making of the transfer Yates was a creditor of the bankrupt. Theretofore, to wit, in February, 1904, he had sold to the Whitehouse Cannel Coal Company, a Kentucky corporation, of

which the bankrupt was general superintendent and treasurer and principal stockholder, a stock of goods purchased by him in connection with the purchase of a building in that city for the use of the Louisa National Bank, of which he was a director, for the sum of $1,321.69, and had received therefor the four months note of the company, indorsed by the bankrupt. This note he discounted with the bank, receiving the proceeds, and the company paying the discount. Thereafter seven times and every four months the note was renewed; the parties thereto always being the same, and the company paying the discount. The last renewal was made June 24, 1906, and was outstanding on July 28, 1906, at the time of the transfer, to become due October 24, 1906. The consideration of the transfer was $1,500, recited in the deed to have been paid cash in hand, of which $1,321.69 was paid by Yates assuming payment of the note, and the balance of which, $178.31, he paid in cash. He did not, however, pay the $178.31 at once on delivery of the deed or to the bankrupt. He paid it at the same time he paid the note, which was October 24, 1906, when it became due, and he paid it to M. F. Conley, cashier of the bank; the payment being to him individually and not as cashier. Just how this came about is not explained in the evidence. The reasonable inference is that at the time of the delivery of the deed, when he assumed payment of the note, he assumed payment of the balance to Conley on account of the bankrupt. It is thus seen that to the extent of $1,321.69 the consideration for the transfer was a past debt.

[1] At this point I cease narrating the facts relevant to the controversy, to consider generally what is essential to make a transfer of property by a bankrupt a voidable preference under section 60b of the bankrupt act, to resume the narration after I have reached a conclusion in regard thereto. To this end the subject of transfer preferences generally, and that first under the bankrupt act as it stood prior to the amendments of 1903, and then as it stood as thus amended, should first be dealt with.

The bankrupt act defines a preference without reference to any consequence following therefrom. This it does in section 60a. It does so by providing therein when a debtor shall be deemed to have given a preference. As it stood before being so amended, it provided that a debtor should be deemed to have given a transfer preference when, being insolvent, he made a transfer of any of his property, the effect of the enforcement of which would be to enable one of his creditors to obtain a greater percentage of his debt than any other of his creditors of the same class. Insolvency, as provided by section 1 (15), exists when the debtor's property, excluding that fraudulently transferred, is insufficient to pay his debts. There were thus two elements in the definition, to wit: (1) The making by the debtor of a transfer of certain of his property, the effect of which would be to enable one of his creditors to obtain such greater percentage; and (2) existing insolvency on the debtor's part at the time the transfer was made. By "one of his creditors" is meant one then holding a past debt against him. It does not include one who, for the first

time, credits him on the faith of a transfer then made. In the case of In re Clifford, 136 Fed. 475, Judge Reed, referring to section 60a, said:

"The purpose of this section is to prohibit the giving of a preference by a bankrupt to existing creditors, and it does not apply to transactions whereby the bankrupt receives a present consideration for the transfer."

It was a slip to say that section 60a prohibits anything. It merely defines. Under the act of 1867 (Act March 2, 1867, c. 176, 14 Stat. 517), in the case of Tiffany v. Institution, 18 Wall. 375, 21 L. Ed. 868, Mr. Justice Davis said:

"The preference at which this law is directed can only rise in case of an antecedent debt."

It is questionable whether the element of insolvency belongs to a logical definition of a preference, and whether, in including it, the section is not somewhat arbitrary. It is possible, however, that a transfer cannot have such effect, unless at the time the debtor is insolvent. I have not thought this matter out. As thus defined a preference was purely objective. It was not concerned with any mental state of either the debtor or creditor. And it is certain that under this section there is no such thing as a preference unless the transfer was in payment of or to secure a past debt existing at the time it was made, and at that time the debtor was insolvent. It was not possible for the transfer to be a preference if made to secure a present loan, or if at the time it was made the debtor was solvent.

As stated, subdivision 60a was confined solely to defining a preference. It had nothing to do with providing any consequence thereof. Its consequences were covered by other provisions of the bankrupt act. Three consequences were so provided. In one instance only was consequence given to a preference as thus defined by itself—i. e., with no accompanying fact—and that was when the creditor who had received it asserted a claim against the bankrupt estate. It was provided by section 57g that his claim should not be allowed unless he surrendered his preference. In the case of Pirie v. Chicago Title & Trust Company, 182 U. S. 438, 21 Sup. Ct. 906, 45 L. Ed. 1171, the Supreme Court held that such consequence should be given to the preference alone, and it would seem that it was immaterial when it was given. Collier on Bankruptcy (6th Ed.) p. 439, says that it was thereby held that "any payment by debtor to creditor after, though without knowledge of, actual insolvency, * * * even though lacking intent and made years before," had to be surrendered by the creditor before he could have his claim allowed. Such a preference may be termed an obstructive preference, in that, unless surrendered, it is in the way of allowing any claim to the creditor receiving it.

In the other two instances in which consequence was given to such a preference, it was not given to it by itself, but only in connection with accompanying facts. By section 3a (2) it was made an act of bankruptcy. In order that it might have such consequence, it was essential that two other facts, in addition to that of preference, exist.

It must have been given with an intent to prefer, and either four months must not have elapsed since it was given, or, if the transfer was recordable, four months must not have elapsed since it was recorded, or, if nonrecordable, four months must not have elapsed since possession was taken before the petition was filed. This is said apart from the fact of actual notice. The fact that it was given with such intent, and the further fact that it was given in such time, or that such time had not elapsed since it was recorded or possession taken under it, had to accompany the fact of the preference in order that it have the consequence of being an act of bankruptcy.

By section 60b it was made voidable. Here, for it to have such consequence, it had to be accompanied at least by the facts that the creditor had reasonable cause to believe that it was intended thereby to give a preference, and that it was made within four months before the filing of the petition, or after the filing thereof and before the adjudication. It was not sufficient that the petition was filed within four months after the transfer was recorded, if recordable, or possession taken under it, if it was not. It had to be filed within four months after it was given. So that it was possible for a preference to be an act of bankruptcy and yet not be voidable. In order that it be an act of bankruptcy, the mental state of the debtor, and not of the creditor, was a material master. But in order that it be voidable apparently the mental state of neither was essential. It was sufficient that there was reasonable cause to believe that the debtor had the mental state of intending to prefer when he gave the preference. It would seem, however, that the mental state, at least of the debtor, was an essential fact in order to a voidable preference, as well as to an act of bankruptcy. And such seems to be the underlying presupposition of the opinion of the Supreme Court as delivered by Mr. Justice McKenna in the case of Pirie v. Chicago Title & Trust Company, supra. The preference involved there, as stated, was an obstructive, and not a voidable, one. The preferred creditor took the position that the same things were essential to an obstructive preference as to a voidable one, and hence that it was essential that there should have been an intent to prefer on the part of the debtor, and not only reasonable cause on the part of the creditor to believe that he had such intent, but actual belief that he had. Mr. Justice McKenna stated the preferred creditor's position in these words:

"It is nevertheless urged that, not only must the act and state of mind of the giving debtor be considered, but the act and state of mind of the receiving creditor must be considered."

As the equivalent of this statement he continued in these words:

"It is not enough that an advantage in fact be given, but to make it a preference 'the person receiving it, or to be benefited thereby, or his agent acting therein,' shall have had reasonable cause to believe that it was intended thereby to give a preference."

And as another way of putting it he continued in these words:

"In other words, it is contended that the quoted words should be read into subdivision 'a' from subdivision 'b.' "

Subsequently he stated the preferred creditor's position thus:

"There should be a guilty knowledge on the part of the creditor of the guilty intent on the part of the debtor."

And again he stated it thus:

"It is urged that the word 'preference' imports the conscious participation of the creditor and debtor in the same intent."

This position of the preferred creditor, as thus stated, was accepted as true of a voidable preference, but denied to be so of an obstructive one. As to it, it was sufficient that a preference had been given. Nothing more was essential. To be noted in this connection is that this statement of Mr. Justice Gray in the case of Wilson Bros. v. Nelson, 183 U. S. 191, 22 Sup. Ct. 74, 46 L. Ed. 147, to wit:

"The act of 1898 makes the result obtained by the creditor and not the specific intent of the debtor the essential fact"

—was made as to judgment preferences, and not as to transfer preferences, with which I am dealing. As Mr. Justice Gray points out, there is a marked difference between the acts of 1867 and 1898 as to judgment preferences, which indicates a legislative intent to leave out the specific intent of the debtor as an element of such preferences. This is not the case as to transfer preferences. And there was good reason for a change in this particular as to judgment preferences that did not exist as to transfer ones. In the former the debtor does nothing. He performs no act. He simply refrains from doing. Where such is the case it is likely always to be difficult to make out that his nonaction is with an intent to prefer. In case of transfer preferences the debtor acts, and the intent with which he acts can more readily be made out.

Such were the provisions of the bankrupt act before the amendments of 1903 in relation to transfer preferences. They defined such a preference and gave three consequences to it. In order to a voidable preference a preference had to be given. It had to be given by the debtor with intent to prefer; the creditor had to have reasonable cause to believe that it had been so given; and it had to be given within four months before the filing of the petition, or after the filing thereof and before the adjudication. The fact that a preference had to be given required that the transfer should be made to pay or secure a past debt, and that when made the debtor was insolvent. These four things, then, had to exist at the time when the transfer was made: The debt to secure which it was given must then have been a past debt; the debtor must then have been insolvent; the debtor must then have intended thereby to prefer the past debt; and the creditor must then have had reasonable cause to believe that the debtor so intended. There was no other possible time to which to refer these things.

This brings us to the changes made by the amendments of 1903. In the first place, they made a change in the definition of a preference by section 60a. They imported into it a time element, and thus made it an arbitrary definition. To be a preference, within the meaning of the section as it now stands, it is necessary that the transfer be

made within four months before the filing of the petition, or after the filing of the petition and before the adjudication, or, if recordable, that it has not been recorded, or, if recorded, four months has not elapsed from its recordation before the filing of the petition. This has been brought about by providing that a debtor will be deemed to have given a preference if, being insolvent, he has "within four months before the filing of the petition or after the filing of the petition and before the adjudication" made a transfer of the character prescribed, and "that such period of four months shall not expire until four months after the date of the recording or registering of the transfer, if by law such recording or registering is required." The former words quoted were omitted from section 60b and inserted in section 60a, thereby making the time when the preferential transfer was made an element of a preference, instead of an element, save subordinately, of a voidable preference. The latter words, which make the time of recording as well as the time of making an element of a preference in case the transfer is recordable, were inserted anew. That they have in view a recordable transfer was decided in the case of Loeser v. Savings Deposit Bank & Trust Co., 148 Fed. 975, 78 C. C. A. 597, 18 L. R. A. (N. S.) 1233. That by reason thereof, as long as a recordable transfer is unrecorded, it remains a preference finds support in In re Beckhaus, 177 Fed. 141, 100 C. C. A. 561.

Again, the amendments of 1903 made a change in the time element of a voidable preference. There is now no time element in a voidable preference as such. All reference to time has been omitted from section 60b. As stated, the reference to time originally in section 60b has been omitted and inserted in section 60a. There is a time element in a voidable preference now because the giving of a preference as defined in section 60a is an element of such a preference, and a preference as thus defined contains the time element heretofore stated. By reason thereof it is not now essential, in order to a voidable preference in any case, that the petition be filed within four months after it was given. It is sufficient, if the transfer by which it was given was recordable, that it has never been recorded or, if it has been recorded, that four months have not elapsed since then before the filing of the petition. It would seem still to be the law that, if the transfer by which the preference was given was nonrecordable, it is not voidable unless made within four months before the filing of the petition, or after the filing thereof and before the adjudication. It is not voidable as long as possession has not been taken under the transfer, or, if possession has been so taken, as long as four months have not elapsed therefrom before the filing of the petition.

The contrary of this was held in the case of Long v. Farmers' State Bank, 147 Fed. 360, 77 C. C. A. 538, 9 L. R. A. (N. S.) 585. It was there held that sections 3 and 60 should be read together, and the provision in section 3 that a nonrecordable preferential transfer could be made an act of bankruptcy within four months after possession was taken under it should be imported into section 60, and it should be read as if it provided that such a transfer within such

time was a preference, and hence also a voidable preference. Concerning this position Mr. Loveland in his work on Bankruptcy (3d Ed., p. 570) says:

"If Congress had intended this clause to be read into section 60a, it is fair to presume that it would have been incorporated in it by amendment."

This criticism of this position seems to me to be sound.

The only other change made by the amendments of 1903 as to preferences was in relation to obstructive preferences. By the amendment to section 57g such a preference was placed on the same basis as that of a voidable one. Now, whenever a preference is voidable under section 60b, it has to be surrendered under section 57g in order to an allowance of a claim by the creditor receiving it; and whenever it is not a voidable preference under the one section, it does not have to be surrendered under the other. The effort was evidently made to put all three preferences on the same basis, and it was successful, except in one particular, to wit, that where a transfer is nonrecordable it can be made an act of bankruptcy as long as possession is not taken under it and four months after possession is so taken, whereas it is a voidable or an obstructive preference only in case the transfer was made within four months before the petition was filed.

Limiting ourselves, now, to voidable preferences under the bankrupt act since the amendments of 1903, we find they are just as they were before the amendment, except in one particular. Before a preference was not voidable unless the transfer by which it was given was made within four months before the filing of the petition, or after the filing thereof and before the adjudication. Now it is voidable if the transfer was recordable, if the petition was filed at any time before it is recorded, or within four months after it is recorded. It is still an essential element of a voidable preference that the transfer was made by the debtor with intent to prefer. In so far voidable and obstructive preferences are like preferences which are an act of bankruptcy. To be an act of bankruptcy, it is necessary that the transfer be made with an intent to prefer. That an intent to prefer on the part of the debtor is an essential element of a voidable preference under the bankruptcy act as it stood after the amendments of 1903 seems to have been first emphasized in the case of Hardy v. Gray, 144 Fed. 922, 75 C. C. A. 562, a decision of the appellate court of the First circuit. It was there laid down, also, that this intent must be an actual intent, and that it is not sufficient that it be an attributed one. Judge Putnam there said:

"Thus, as the statutes now stand, * * * all artificiality has disappeared, and the word 'preference,' as well as the word 'intended,' may be read with their natural meaning, subject, of course, to the general rules by virtue of which, under certain circumstances, an act from which a result ensues may sometimes be held to contemplate and purpose the result."

He stated the position of the lower court in these words:

"It appears to us that by this the learned judge eliminated the element of actual intention on the part of the debtor to give a preference. In other words, the rule laid down is apparently that, so long as the debtor is insolvent, and knows that he is insolvent, and makes a payment of a pre-existing debt, the intent to prefer is a presumption of law. Whatever may

have been the meaning of the learned judge, we understand that on the whole he held the view of the law which the trustees squarely took before us; that is to say, 'that all that it is necessary for them to prove is that Powers and Mayer and Hardy had reasonable cause to believe that Andrews was insolvent on the dates in question.' "

As to the position of the trustees before the appellate court he said further:

"Following this out, the trustees proceeded to argue at length against the proposition that to prove a preference it is necessary to show that the debtor actually intended to give one and that the creditor had reasonable cause to believe that there was this actual intention."

Concerning the natural reading of the statute he said:

"We have shown that an element expressly contained therein is that the creditor shall have had reasonable cause to believe that it was intended thereby to give a preference. Naturally and justly it would be said that no one could be charged with a reasonable cause to believe something, unless that something existed to which the belief was supposed to relate. It is true that the ordinary rule that a person who does an act is supposed to contemplate what results therefrom applies to cases of this class, but only as an element; and it cannot apply, even as an element, unless the party who does the act has a knowledge of the essential facts which tend to produce the resulting consequences, or at least has a reasonable cause to believe them or purposely shuts his eyes."

He considered the authorities under the act of 1867 and the present statute relevant to the question and stated the result of his consideration in these words:

"These propositions [quotations from decisions of the Supreme Court under act of 1867] establish that the intent to prefer under the act of 1867 was held to be an actual intent, and not an attributed one. We find no change in the decisions with reference to the present statutes."

And just here it should be noted that there was no radical change in the phraseology of the two acts as to transfer preferences, such as was the case with reference to judgment preferences, as was pointed out by Mr. Justice Gray in Wilson Bros. v. Nelson, supra. This position has been approved by the appellate court of this circuit in the case of In re First National Bank of Louisville, 155 Fed. 100, 84 C. C. A. 16. Judge Severens there said:

"But, to make the reception of payment a preference, the creditor must have had reasonable cause to believe that the debtor was intending to give him a preference over the other creditors, and we incline to think, with the Circuit Court of Appeals for the First Circuit (Hardy v. Gray, 144 Fed. 922 [75 C. C. A. 562]), that the reasonable implication is that the debtor himself must have intended the preference. The very word signifies the doing of a thing with a purpose to give an advantage; and the construction which treats the notion of the debtor as indifferent seems artificial and awkward."

That its position had been so approved was recognized by the appellate court of the First circuit in the case of Curtiss v. Kingman, 159 Fed. 880, 87 C. C. A. 60. It has also been approved by the appellate court of the Fifth circuit in the case of Tumlin v. Bryan, 165 Fed. 166, 91 C. C. A. 200, 21 L. R. A. (N. S.) 960. Judge Shelby there said:

"The reasonable implication of the statute, it has been held, is that the debtor himself must have intended the preference. In re First National

Bank, 155 Fed. 100 [84 C. C. A. 16]; Hardy v. Gray, 144 Fed. 922 [75 C. C. A. 562]."

And in the recent case of In re Leech, 171 Fed. 622, 96 C. C. A. 424, Judge Severens set forth the essential elements of an unlawful preference, either an obstructive or voidable one, apart from the time element, in these words:

"In order to establish that there was an unlawful preference, it must be alleged and proved that at the time of the transfer the party making it was insolvent, that the property transferred was such as his creditors had a right to have subjected to their claim, *that he intended a preference*, and that the transferee had reasonable cause to believe that the transferror had such an intention."

In the case of Benedict v. Deshiel, 177 N. Y. 1, 68 N. E. 999, the New York Court of Appeals held that the intent of the debtor was not a material element of a voidable preference. It based its decision on the case of Pirie v. Chicago Title & Trust Co., supra. But it overlooked the fact that the Supreme Court was dealing there with an obstructive preference, and not with a voidable one, and that, as the bankrupt act stood before the amendments of 1903, when the two kinds of preferences were radically different, and the presupposition of the case was that as to a voidable preference the intent of the debtor was an element thereof.

Judge Archbald, of the Middle district of Pennsylvania, deals with the question in an article entitled "Frauds and Preferences" in 44 Am. Law Rev. pp. 481–497. It is doubtful whether in his view an intent on the part of the debtor to prefer is an element of a voidable preference. He begins with the statement:

"An intent to prefer is made an element of a preference in section 3a (2), where the different acts of bankruptcy are enumerated, and is therefore presumptively an element of a voidable preference as specified in sections 60a, 60b. It is also implied in the condition attached to the latter in order to make it voidable that the party benefited shall have reasonable cause to the belief that a preference was in fact intended."

This seems to concede that an intent to prefer is an element of a voidable preference. He then takes issue with the position that this intent must be an actual one, and not an attributed one. He refers to the cases of Western Tie & Timber Co. v. Brown, 196 U. S. 502, 25 Sup. Ct. 339, 49 L. Ed. 571, and Coder v. McPherson, 152 Fed. 951, 82 C. C. A. 99, and the case of Toof v. Martin, 11 Wall. 40, 20 L. Ed. 481, under the act of 1867, as favoring the position that an attributed intent is sufficient. And then he refers to the decision of the appellate court of the First circuit in Hardy v. Gray, supra, as holding "that the intent to prefer is an actual and not an attributed one," and to the support it has received from the appellate courts of the Fifth and Sixth circuits. From this holding he says:

"It follows, if taken literally, that in any case, if the bankrupt denies an intent to prefer, however it may be the incontestable consequence of his act, there is no preference, and not only must his denial be received in evidence, but the jury must be instructed to find for the defendant if they believe this statement."

As to this position he says:

"This is a mischievous doctrine, which I cannot regard as a correct interpretation of the law. It has not got much of a foothold as yet, and it is to be hoped that it will not. But it needs attention."

So far his antagonism seems to be to the position that the intent must be an actual intent, and not to the position that there must be an intent to prefer. But really the position that an attributed intent is sufficient eliminates an intent to prefer as an element of a voidable preference. He thereafter proceeds on the idea that it is not, and gives two reasons for its not being. One he puts thus:

"To the contrary of what is so held [i. e., there must be an actual intent] is section 60a, where a preference is defined, there is nothing said about intent, the character of the transaction being made to depend solely on the preferential effect of it. * * * Entire sight seems to be lost of this provision in the decisions which have been referred to."

This, however, overlooks the fact that section 60a has to do with a preference, and not with a voidable preference. It is true that an intent to prefer is not an element of a preference. The elements of a preference are purely objective, as heretofore stated. But it does not follow from this that an intent to prefer is not an element of a voidable preference. That it is so is heretofore shown, and as we have seen he starts out with the concession that it is. The other reason he puts in these words:

"The distinction in this respect between the acts of 1898 and 1867 is expressly recognized and made the basis of decision in Wilson v. Nelson, where it is declared that the cases under the earlier law, such as Wilson v. City Bank [17 Wall. 473, 21 L. Ed. 723], do not apply; the act of 1867 expressly requiring the debtor to have acted with intent to prefer. By the act of 1898 the essential thing is the result to the creditor."

But, as already pointed out, this distinction, recognized by and made the basis of the decision in Wilson Bros. v. Nelson, supra, has to do with judgment preferences. It has nothing whatever to do with transfer preferences. As to judgment preferences the two statutes are radically different, and there was reason for not requiring an intent to prefer to be an element of a judgment preference, as I have heretofore set forth. There is no substantial difference between the two as to transfer preferences, and the reason for omitting an intent to prefer from the elements of a judgment preference does not exist. at least with as much force as to a transfer preference.

The position that the intent to prefer must be an actual intent was urged upon the appellate court of the Eighth circuit in the case of First National Bank v. Abbott, 165 Fed. 852, 91 C. C. A. 538. Judge Sanborn had this to say concerning it:

"Counsel contend that an actual intent of the debtor to create a preference was indispensable to the avoidance of a preference given by it within the four months, and that there was no substantial evidence of such an intention. It is unnecessary in this case to consider or decide whether or not such an intent was requisite, for the evidence is convincing that the shoe company was insolvent, and that under the circumstances surrounding the transaction the inevitable effect of the arrangement was a preference, and the law conclusively imputes to the shoe company the intention to bring about the result which necessarily arose from the nature of the act which it per-

formed (Western Tie & Timber Co. v. Brown, 196 U. S. 502, 508, 509 [25 Sup. Ct. 339, 49 L. Ed. 571]; Wilson v. City Bank, 17 Wall. 473, 486 [21 L. Ed. 723]), so that the only real question in this case is, Did the bank have reasonable cause to believe a preference was intended when it received it?"

This statement—that, if the inevitable effect of or the result which necessarily arises from a transfer is a preference, the law conclusively presumes an intention to prefer—seems to eliminate the idea that the intent must be actual. It makes no reference to the state of knowledge of the debtor as to such being the inevitable effect or necessary result of his act, and does not concede the possibility that, whilst this is so, the debtor may not so understand it, and, notwithstanding it, may think otherwise. It finds support in substantially the same language used by Mr. Justice White in the case of Western Tie & Lumber Co. v. Brown, cited by Judge Sanborn. He there said:

"And if the inevitable result of the transaction would have been to create such a preference, then the law would conclusively impute to Harrison the intention to bring about the result necessarily arising from the nature of the act which he did. Wilson v. City Bank, 17 Wall. 486 [21 L. Ed. 723]."

But by referring to the case cited we find that Mr. Justice Miller puts the matter more accurately and in a way which permits of an actual intent. He there said:

"The general legal proposition is true that where a person does a positive act, *the consequences of which he knows beforehand,* he must be held to intend those consequences."

This statement limits one, not to the inevitable effect or necessary result of an act, irrespective of the state of knowledge of the doer of the act, but takes that into consideration. He must know the consequences beforehand, in order that he be held to intend them. And, concerning the intent to prefer under the act of 1867, he said:

"There must be the positive purpose of doing an act forbidden by that statute, and the thing described must be done in the promotion of this unlawful purpose."

And in the earlier case of Toof v. Martin, 13 Wall. 48, 20 L. Ed. 481, Mr. Justice Field put the matter thus:

"It is a general principle that every one must be presumed to intend the necessary consequences of his acts. The transfer, in any case, by a debtor of a large portion of his property, while he is insolvent, to one creditor, without making provision for an equal distribution of its proceeds to all creditors, necessarily operates as a preference to him, and must be taken as conclusive evidence that a preference was intended, unless the debtor can show that he was at the time ignorant of his insolvency, and that his affairs were such that he could reasonably expect to pay all his debts. The burden of proof is upon him in such case, and not upon the assignee or contestant in bankruptcy."

This recognizes that the knowledge and expectation of the debtor must be considered in determining whether there is an intent to prefer, and that, notwithstanding a transfer may in fact inevitably result in a preference, it may not be so intended by the debtor. The knowledge of the debtor need not be shown by direct evidence. It is sufficient that it is a legitimate inference from the circumstances.

Where one knows that the inevitable effect and necessary result of

a transfer made by him to a creditor will be to give him a preference, the reasonable inference is—no other inference is possible, and it must be held—that he intends to give a preference and has a positive purpose of doing an act forbidden by the bankrupt act. The presumption that he so intends is not a presumption of law, but one of fact; and such a position is, therefore, consistent with the view that the intent to prefer must be actual. Judge Putnam thus puts the matter in one of the quotations from his opinion in Hardy v. Gray made above:

"It is true that the ordinary rule that a person who does an act is supposed to contemplate what results therefrom applies to cases of this class, but only as an element; and it cannot apply, even as an element, unless the party who does the act has a knowledge of the essential facts which tend to produce the resulting consequences, or at least has reasonable cause to believe them or purposely shuts his eyes."

As to the case of Western Tie & Lumber Co. v. Brown he had this to say:

"To understand Western Tie & Lumber Co. v. Brown, it is necessary to examine the case as it appeared before the Court of Appeals, as well as before the Supreme Court. The question was one of set-off, and not of preference. We think, so far as the appeals before us are concerned, the only expressions of the Supreme Court under the present statutes are those in Pirie v. Chicago Title & Trust Co., 182 U. S. 446, 447 [21 Sup. Ct. 906, 45 L. Ed. 1171], already referred to, which emphatically declare that the subdivision of the statute of 1898, already quoted, adopted by the section of 1903, involves the element that the 'creditor had reason to believe a preference was intended,' which could not exist unless in fact a preference was actually intended on the part of the debtor, or unless there existed what the law regards as the equivalent thereof."

What he referred to by the last expression as to "what the law regards as an equivalent thereof" will be found explained in the case of Rutland Co. Nat. Bank v. Graves, 156 Fed. 168, by Judge Martin in his analysis of the case of Western Tie & Lumber Co. v. Brown.

I will therefore dispose of this case upon the idea that, in order to a voidable preference under section 60b, it is essential that the debtor should have actually intended to give a preference by the transfer complained of, as well as that the creditor should have had reasonable cause to believe that he so intended. This being so, it is possible for a debtor to be insolvent, and for him to know that he is insolvent, and yet for a transfer by him to a creditor of a portion of his property in payment of a past debt not to be made with an intent to prefer. As said by Judge Hale in the case of Stevens v. Oscar Holway Co., 156 Fed. 90:

"The intention to prefer must be an actual intent and not an attributed one," and "it cannot be presumed from the fact alone that the debtor knew he was insolvent when he made the payment of a pre-existing debt."

The debtor's knowledge of conditions and his expectations and hopes may be such that he may have no thought whatever of the fact that the transfer will work a preference. Cases of this sort are thus referred to by Mr. Justice Miller in Wilson v. City Bank, supra:

"Many find themselves with ample means, good credit, large business, technically insolvent; that is, unable to meet their current obligations as fast as they mature. But, by forbearance of creditors, by meeting only such

debts as are pressed, and even by the submission of some of their property to be seized on execution, they are finally able to pay all and to save their commercial character and much of their property. If creditors are not satisfied with this, and the parties have committed an act of bankruptcy, any creditor can institute proceedings in a bankrupt court. But, until this is done, their honest struggle to meet their debts and to avoid the breaking up of all their business is not of itself to be construed into an act of bankruptcy or as fraud upon their part."

They are thus referred to in the opinion in Grant v. National Bank, 97 U. S. 80, 24 L. Ed. 971:

"The debtor is often buoyed up by the hope of being able to get through with his difficulties long after his case is in fact desperate; and his creditors, if they knew anything of his embarrassment, either participate in the same, or at least are willing to think that there is a possibility of his succeeding."

To the same effect is this expression of Judge Severens in the case of In re First National Bank, supra, under the present act:

"But it is enough to say that a belief that a debtor is insolvent is a very different thing from a belief that he intends a preference; for it would often, and probably generally, happen that a person, though in fact insolvent, would, while continuing his business in the usual way, make payment without a thought of disparagement of other creditors and with confidence in his ability to pay them all. And upon like considerations the creditor may share in the confidence of the debtor, and may well suppose that the debtor, while paying him his debt in the common course of business, is acting without any purpose of giving special favor."

[2] Before quitting this general survey, one other matter remains to be considered. That is the exact significance of the 1903 amendment to section 60a that:

"Such period of four months [i. e., "four months before the filing of the petition"] shall not expire until four months after the date of recording or registering of the transfer, if by law such recording or registering is required."

We have seen that the meaning is that, in case a preferential transfer is recordable, it shall remain a preference as long as it is not recorded, or, if recorded, four months has not elapsed from its recordation. Has it any further significance? Is the effect of it that, in case the transfer has been recorded, the question as to whether it is a preferential transfer—i. e., whether in other respects it is a preference, and as to whether in such respect it is a voidable and obstructive preference—is to be determined as if it had been made at the date of recording; i. e., had then first come into being? That such was the effect of this amendment has been held in a number of cases. I have been cited to and come across the following, to wit: English v. Ross, 140 Fed. 630; First Nat. Bank v. Connett, 142 Fed. 33, 73 C. C. A. 219, 5 L. R. A. (N. S.) 148; Long v. Farmers' State Bank, 147 Fed. 360, 77 C. C. A. 538, 9 L. R. A. (N. S.) 585; In re Reynolds, 153 Fed. 295; In re Hickerson, 162 Fed. 345; McElvain v. Hardesty, 169 Fed. 31, 94 C. C. A. 399.

English v. Ross was decided by Judge Archbald, from whose article I have heretofore quoted. There the bankrupt was a retail grocer and the preferred creditor a jobber. Two transfers were sought to be avoided as voidable preferences. One was made long before the

enactment of the bankrupt act, to wit, April 21, 1894, and the other long before the filing of the petition, to wit, July 30, 1900. Both were recordable transfers, being absolute deeds of real estate. They were put on record June 2, 1903, and the petition was filed four days later, to wit, June 6, 1903. Though both the deeds were absolute on their face, they had in fact been given as security for certain indebtedness. The first one covered two lots, of the value of $4,000, and was given to secure an existing indebtedness of $573.54 for goods bought and for indorsements in bank, the extent of which is not given, and any future indebtedness or obligations of like character. When the second transfer was made the indebtedness had increased to $3,487.68, and the indorsements to $3,500; the two together amounting to about $7,000. It did not include any of the original indebtedness. Judge Archbald said:

"It is safe to conclude that the original debt of $573 is long since paid, together with whatever after that antedated the passage of the act."

The second transfer covered an undivided one-seventh interest in certain real estate, of the value of $1,000. It was made as additional security for the then existing indebtedness of $7,000. Both transfers were held to be voidable preferences, and were avoided. This conclusion was reached by judging them as if they had first come into being June 2, 1903, the date when they were recorded. Judge Archbald said:

"The present bill is based upon the contention that as against subsequent bankruptcy the defendant's deeds are to be judged as of the date of record only, and being given for the purpose of securing the indebtedness of the bankrupt, who was hopelessly insolvent and whose estate will pay but a few cents on the dollar, that they constitute a preference, which the defendant had reasonable cause to believe was intended, and which, being within the four months period, is therefore voidable at the instance of the trustee."

He then considers the facts, and shows that, "treating the transaction as of the date when the defendant put his deeds on record," the deeds were voidable preferences, and says:

"The case turns, therefore, on whether the transfer of property effected by the deeds is to be judged as of the dates when they were, respectively, executed, or as of June 2, 1903, when they were left for record; the latter only being within the four months period prior to bankruptcy necessary to make out a preference."

His conclusion he stated in these words:

"It seems to me, therefore, clear that, in any case where the facts are the same as here, a deed by which a transfer of a bankrupt's property is effected, and under which no possession is taken, is to be judged, on the question of preference, by the date when it is put on record, regardless of the date of delivery, and that tested by this the conveyances to the defendant cannot stand. I do not lose sight of the fact that the first of these was several years prior to the passage of the bankrupt act, which is not to be given a retroactive effect, if it can be avoided. But the security thereby provided was a continuing one. It was not given merely for the debt then due, but also for whatever might subsequently become so; and it is safe to conclude that the original debt of $573 is long since paid, together with whatever after that antedated the passage of the act. Thereafter the defendant held his deeds subject to the condition there imposed, and at the risk, if not duly put on record, of having them declared void, as here, upon the intervention of bankruptcy within four months after they were. If the

result seems in any way harsh. it·is to be remembered that by withholding them as he did. and allowing the bankrupt to remain in full possession and enjoyment of his property, the defendant enabled him to secure false credit, which has worked fully as much injury to others entirely innocent."

It will be noted that as to the first deed, except as to the then existing indebtedness, it was made as security for future advances. It has been held that such a mortgage or pledge cannot be held to be a preferential transfer. Loveland on Bankruptcy (3d Ed.) p. 586, says:

"A mortgage has been held valid when given to secure future advances to be made to the debtor."

The advances subsequently made by the grantee in this deed were future when the deed was made, but past when it was recorded. It was only, therefore, by treating the deed as having first come into being when recorded that it could be held as given to secure a past or antecedent debt, and this requirement of a preference within the meaning of section 60a could be met. Again, there was no evidence as to the solvency of the debtor when the deeds were made, or as to when the second deed was made, which was to secure past indebtedness. He was hopelessly insolvent when both deeds were recorded. It was only, therefore, by treating those deeds as having first come into being that they could be held as given when recorded, when the debtor·was insolvent, and the requirement of a preference within the meaning of section 60a could be met.

The preference involved in the case of First National Bank of. Buchanan County v. Connett was an obstructive one, and consisted of two recordable chattel mortgages, one made October 31, 1902, and the other June 26, 1903. They were withheld from record until August 21, 1903. Seemingly they were made to secure past indebtedness. The petition in bankruptcy was filed September 24, 1903. Judge Hook stated the question involved there in these words:

"When the mortgages were executed the mortgagor was insolvent. but the bank to whom they were given did not know it. and had no reason to believe he intended to give it a preference. One of them was withheld from record about ten months, and the other about two months. When they were recorded, which was about a month before the petition in bankruptcy was filed. the bank knew the mortgagor was insolvent and contemplated a disposition of his property to secure certain of his creditors. It also knew that the inevitable effect of the enforcement of the mortgages would be to give it a greater percentage of its claims than other creditors. The question for determination is whether under the foregoing facts there arose a voidable preference as defined by the national bankruptcy act of 1898, as amended in 1903."

It was held that such a preference arose thereunder. Judge Hook said:

"The bankrupt was insolvent when he executed the mortgages and when they were recorded. The mortgages constituted a transfer of his property, and their effect was to enable the bank to obtain a greater percentage of its claims than other creditors. They were recorded within four months of the filing of the petition in bankruptcy. Therefore, assuming that a recording is required by the law of Missouri, it follows that a perference arose under section 60a. And in our opinion it also follows that the preference arose when the mortgages were recorded, and not as of the date they were given. In other words, the amendment of 1903, was intended to remedy the

evil resulting from secret instruments of transfer of the bankrupt's property, the withholding them from record until shortly before the institution of bankruptcy proceedings, and the then assertion of them as of the prior date of their execution and delivery. And this was accomplished by making the rights of a creditor thus favored determinable by the conditions existing when he caused the transfer to him to be recorded as required by the state law, rather than those existing at the time he secured it. Under the act of 1867, not only the question of requirement to record a chattel mortgage, but also the effect of noncompliance therewith, were exclusively controlled by the law of the state. The same construction has been applied to the original act of 1898. Unless there has been some departure from this construction in its relation to voidable preferences, the amendment of 1903 of section 60a, upon which subdivision 'b' thereof depends, is wholly without significance. Contrary to a presumed intent in legislative amendments, it serves no purpose and performs no office whatever. Such result can be reasonably avoided by this construction of the amendment. It affects only those instruments of transfer which the state law requires to be registered or recorded; and as to those, where there is delay, it provides that upon the question of voidable preferences they shall speak as of the day of compliance with the local law, and not as of the day they were given. This precludes the application of the doctrine of relation, and it would entail a consequence upon failure to record that might not be imposed by the law of the state; but we deem it to be, not only within the letter of amendment, but also within the intention to correct an evil which flourished under the construction of the original act."

The transfer involved in the case of Long v. Farmers' State Bank was a nonrecordable one. The bankrupt, a merchant, on December 31, 1903, owed the bank an overdraft and $4,700 on account of two notes of that date. It does not appear that the two notes represented a then past debt. For aught that appears, the indebtedness may have been created at that time. On that date he had $7,000 insurance on his stock of goods, and he gave the bank a written agreement whereby, as collateral security for his overdraft and notes, he agreed to keep that amount of insurance on his stock of goods and assigned same to the bank, retaining the policies himself. He was solvent at this time. June 22, 1904, his entire stock of goods was destroyed by fire and he was thereby rendered insolvent. June 28, 1904, he paid to the bank the sum of $5,075, the amount collected from the insurance company in payment of his indebtedness to it. Within four months thereafter, to wit, October 13, 1904, an involuntary petition in bankruptcy was filed against him. It was held that the trustee was entitled to recover the money paid the bank as a voidable preference. The real basis of the decision was that there was no transfer to the bank until the payment of the money, and that being within the four months, and otherwise a voidable preference, it was so adjudged. In considering the contract of December 31, 1903, Judge Philips said:

"Clearly this did not constitute an assignment of the policies in præsenti. This contract was no more than the personal agreement or undertaking of Wells that he would keep the property insured and in case of loss he would collect and pay over to the bank sufficient to liquidate the debt. The contract conveyed nothing."

But the learned judge did not stop here. He proceeded to dispose of the case on the basis that the contract did transfer something. He said:

"On the other hand, if the view be tenable that the agreement between Wells and the bank created an equitable lien upon the fund when collected

from the insurance company, the question arises: When did this lien become operative, in view of the provisions of the bankrupt act? Was it on the 31st day of December, 1903, the date of the alleged contract for transfer, or on the 28th day of June, 1904, the date of the payment of the money? At the former date Wells was solvent. At the latter date he was insolvent. This question is to be solved alone by the provisions of the bankrupt act."

He then holds that sections 3 and 60 should be read together, and the provision in section 3 that a nonrecordable preferential transfer could be made an act of bankruptcy within four months after possession taken under it should be imported into section 60, and it should be read as if it provided that such a transfer could be avoided as a voidable preference if the petition was filed within four months after possession was taken under it. I have heretofore quoted Mr. Loveland's criticism of this position.

Having taken it, Judge Philips took the further position that whether the transfer was a voidable preference should be judged as of the date when possession was taken under it, and not as of the date when made.

"There was, therefore, no effective transfer of this property under the bankrupt act until June 28, 1904, when the money was turned over by the insolvent to the bank, and this for the palpable reason that that was the first time the bank took possession of the property or gave any recognizable notice to any creditor of the bankrupt of its asserted title or lien. This we hold is so both upon reason and the weight of authority."

Amongst the authorities cited was the case of English v. Ross, but no reference was made to that of the First National Bank of Buchanan County v. Connett, decided by the same court. Here a part of the indebtedness was created simultaneously with the execution of the transfer, and the debtor was then solvent. At date of record all the indebtedness was past and the debtor was insolvent.

In the case of In re Reynolds, one Poynter loaned to the bankrupt $1,200, and received as security therefor a mortgage in form of a bill of sale on his stock of goods, fixtures, storehouse, and lot. This was on May 1, 1906. The bankrupt was allowed to remain in possession and sell from the stock of goods, and buy and add new stock thereto. The mortgage was never recorded. On March 19, 1907, the bankrupt surrendered the property to the mortgagee. It is not stated when the petition in bankruptcy was filed, but it was some time after March 19, 1907, and before April 27, 1907. It was held that the trustee was entitled to the property as against the mortgagee. The ground upon which he was held entitled to the stock of goods was that under the state law the mortgage loan was void as to it. Judge Rogers said:

"The mortgage on the stock of merchandise left in possession of the bankrupt, with the right to sell in the usual course of business and to buy and to add new stock in the same manner, was void as to creditors ab initio, and continued void even after possession was taken, for the reason that it was fraud upon creditors under the Arkansas decisions."

The mortgage on the fixtures and storehouse lot, though invalid as to creditors under the state law until possession was taken by the mortgagee, thereupon and thereafter became valid as to creditors. Judge Rogers said:

"Under the law of Arkansas, as we have seen, the lien does not attach as against creditors until the mortgage is filed for record, and in Birnie v. Main, 29 Ark. 595, the court said: 'The effect of recording a mortgage or other conveyance is not retrospective.' Nor in the opinion of the court does the taking possession by the mortgagee of the mortgaged property operate retrospectively. * * * If the lien attached at all in this case, it was when the possession was taken, and not before, for the mortgage was never recorded."

And again he said:

"I do not find such a mortgage is void as to creditors under the Arkansas decisions; and, if not void as to creditors under the Arkansas decisions, it is not invalid under the bankrupt act as to the trustee, unless made void by some positive provision of the act. Is the mortgage void as against the trustee by some positive provision of the bankrupt act?"

He answered this question in the affirmative and said:

"This question, I think, has been answered conclusively by the Eighth Circuit Court of Appeals in the case of First Nat. Bank of Buchanan County v. Connett, reported in 142 Fed. 33 [73 C. C. A. 219, 5 L. R. A. (N. S.) 148]. That case to all intents and purposes is on all fours with the case at bar. Indeed, the only difference is that in that case the mortgagor was insolvent when the mortgage was given, but the mortgagee was not aware of it. In the case at bar the testimony does not show whether the mortgagor was insolvent when the mortgage was given or not. But he was insolvent, and the mortgagee knew it, when she took possession. The difference is immaterial, in the opinion of the court, and therefore the two cases are on all fours."

And again he said:

"The conclusion reached is that the mortgage is void in toto under section 60a of the bankruptcy act of 1898, as amended by section 13, Act Feb. 5, 1903."

Here, again, the transfer was made to secure a present debt, and it was not shown that he was then insolvent. But, as the debt was past due and the debtor was insolvent when possession was taken, it was held to be a voidable preference.

In the Case of In re Hickerson, the bankrupt, a merchant, on March 22, 1906, gave a mortgage on his stock of goods to his banker to secure two notes, for $3,000 each, given for past indebtedness. The mortgage was recorded February 11, 1907, and five days later, February 16, 1907, the petition in bankruptcy was filed. The mortgage was attacked as a voidable preference and so held. Judge Dietrich said:

"Does the mortgage transaction as disclosed by the record constitute a preference under section 60a of the bankrupt act? By the amendment of 1903 it provided that to constitute a preference the period during which the transfer is made shall not expire until four months after the date of the recording or registering of the transfer, if by law such recording or registering is required. The mortgage 'transfer' must therefore be deemed to have been made on the 11th day of February, 1907, only five days before the filing of the petition in bankruptcy. Humphrey v. Tatman, 198 U. S. 91 [25 Sup. Ct. 567, 49 L. Ed. 956]. It is earnestly argued by counsel for the bank that the evidence is insufficient to show the insolvency of the debtor on February 11, 1907; but, although the record is somewhat meager and unsatisfactory, I think it is sufficient to bring the transaction within the statutory definition of a preference."

Some consideration was given to the financial condition of the bankrupt when the mortgage was given, at which time he seems not to have been certainly insolvent; but his financial condition at the time the mortgage was recorded was treated as the material thing.

In the case of McElvain v. Hardesty a chattel mortgage was on December 9, 1904, given to secure an indebtedness then created. It was not recorded until July 7, 1905. The petition in bankruptcy was filed October 30, 1905. The recording, therefore, was within four months before the filing of the petition. As to the standing of the mortgage under the state law, Judge Adams said:

"The law of Missouri made it invalid and void against creditors * * * until recorded or filed in the records of office. * * * This is particularly true as against subsequent creditors, like those represented by the trustee in this case, who incurred their debts on the faith of an apparently unincumbered and unconditional ownership by their debtors of their property."

It was not stated whether the mortgage remained void after record as to such creditors. The sole reason for referring to the state law seems to have been to make out that the mortgage was recordable. The mortgage was suppressed on the ground that it was a voidable preference. Judge Adams said:

"The effect of the transfer to McElvain is to be judged as if made on the 7th day of July, 1905, when it was filed for record. If Crawford and Carter were then insolvent, and if the effect of the enforcement of the transfer was to enable McElvain to obtain a greater percentage of his debts than any other of their simple contract creditors, the transfer constituted a preference within the meaning of the bankruptcy law."

And again he said:

"As, for the purposes of this case, the transfer is to be treated as made on the date the agreement is recorded, so the transferee's belief or cause for belief concerning it must relate to that time."

He then considered the facts and circumstances as they existed at the time of the record, and reasoned that they showed that the mortgagee then had cause for belief that the mortgage was intended as a preference.

This analysis of these six causes shows clearly that they bear out the position that the effect of the amendment of 1903 was to require that in determining whether a recorded transfer was a voidable preference, a question which involved the subordinate question whether it was a preference, it must be judged as if it had first come into being at the date of recordation. They come mainly from the Eighth circuit; three of them being decisions of the appellate court of that circuit. The first one, English v. Ross, was decided by Judge Archbald, to whose article in the last number of the American Law Review I have referred. It may be presumptuous on my part to take issue with such a weight of authority, but I cannot get my mind to consent to the position there taken. It seems to me that a superficial view of sections 60a, 60b, is against it. No such thought is expressed by the language of section 60a. It does not say in so many words, or in substance, that a recorded transfer is to be judged as of the date of record, and not as of the date of making, in determining

whether it is a preference. It first provides that, to be deemed a preference, the transfer must have been made "within four months before the filing of the petition or after the filing of the petition and before the adjudication." It then provides that "such period of four months"—i. e., the four months period referred to in the previous words—"shall not expire until four months after the date of the recording," etc. If these additional words of prolongation were not there, certainly the date of recording of the transfer could not possibly have anything to do with determining whether the transfer was a preference. How, then, is it possible to make out that they require that a recorded transfer shall be judged as of the date of recording in determining whether it is a preference? Section 60b, relating to voidable preferences, says nothing whatever on the subject of recording. It is only because a preference as defined in section 60a is an element of a voidable preference that the matter of recording has any bearing upon such preference.

This position must be accounted for, therefore, by something else other than the language of sections 60a, 60b. Judge Hook in First National Bank of Buchanan County v. Connett, supra, says that, if such effect is not given to the amendment of 1903 of section 60a, it is "wholly without significance." In the same line he continues:

"Contrary to presumed intent in legislative amendments, it serves no purpose and performs no office whatever."

Is this so? I think that but few words will demonstrate that it is not. Before the amendment of 1903 a recordable transfer, made to pay or secure a past debt, made whilst the debtor was insolvent, made with guilty intent on his part to prefer the creditor, and made under circumstances which established beyond question, not only that he had reasonable ground to believe that it had been made with such intent, but that he participated therein and was equally guilty with the debtor, was safe from attack if four months had elapsed from its making without a petition being filed, though it could be made an act of bankruptcy, notwithstanding this, if it had not been recorded, or, if recorded, four months had not elapsed from its recordation. Is it not possible that it was intended by the amendment to prevent such a transfer so made being beyond attack if a petition in bankruptcy was not filed in four months after it was made, and to place it on the same footing as a voidable preference which it had as an act of bankruptcy, thus making it voidable where it could be and was made such an act? And if it was so intended and had such an effect, can it be said that it was "wholly without significance"? Indeed, if such was its effect—and certainly it did have such effect, at least—it had decided significance. Without it the bankrupt act in this particular was deficient. It called for an amendment with just such an effect. And it seems to me obvious that such was its significance, and its sole significance. It simply prolonged the time in which, by the filing of a petition in bankruptcy, a recordable preferential transfer might be deemed to be a voidable preference. It had nothing whatever to do with changing the date as of which it was to be judged in de-

termining whether all the elements of a voidable preference were present.

Several considerations may be adduced as demanding that such significance, and such significance only, be given to the amendment of 1903 of section 60a. One is that the position, taken in the early part of this opinion, that an actual intent on the part of the debtor to prefer is an essential element of a voidable preference, requires it. This position, and the position that a recorded transfer is to be judged as of the date of its recordation, and not as of the date of its making, are inconsistent. The two positions cannot stand together. The latter position takes us away from the actual into the region of the artificial and constructive. According to it the question is, not what the debtor actually intended when he made the transfer, but what must it be said he would have intended, had he made it when it was recorded. It is not possible for the debtor to have had any actual intent in a matter with which he has had nothing to do, to wit, the recording of the transfer. That is the act of the creditor. The sole act with which the debtor is concerned is in making the transfer. Of course, a debtor may connive with the creditor in the withholding of the transfer from record. But the position, if sound, takes in the case where he has not so connived, and has had no part whatever in the transfer being withheld from record, or in its subsequent recording.

Another consideration is that the position with which we are dealing changes a transfer made to secure a present debt, and made at the time the debtor was amply solvent, into a voidable preference. This happened in several of the cases above considered, as I have pointed out. The theory on which they proceeded was that, judging the transfer as of the date when recorded, the debt which was present when the transfer was made had at the time of record become past, and the debtor, though solvent at the former date, had in the meantime become insolvent. Now, I cannot conceive how it is possible ever to make a voidable preference out of a transfer made to secure a present debt and when the debtor's solvency was unquestioned.

Still another consideration is that this position takes a voidable preference beyond a preference which is an act of bankruptcy. It makes a voidable preference out of a transfer, not only where it is made with no actual intent to prefer, but where, as we have seen, it is made to secure a present debt, and made when the debtor was solvent. I have made no search to find whether it has ever been held in any state of case that such a transfer was an act of bankruptcy, but I feel quite confident that there is no such case. In order for a transfer ever to be an act of bankruptcy, it must be made to pay or secure a debt past due when made, made whilst the debtor was insolvent, and made with an actual intent to prefer. The provision as to recording or taking possession in section 3 simply prolongs the time with which a transfer so made may be made an act of bankruptcy. The object of the amendment of 1903 was to lift voidable preferences and obstructive preferences to the same plane as prefer-

ences which were acts of bankruptcy, not to take them beyond such preferences.

And still another consideration: The position in question takes recorded transfers out of line with nonrecorded ones, and also out of line with recorded ones where the transfers have been both made and recorded within the four months before the filing of the petition, as was the case here. An unrecorded transfer may be either one that was recordable or one that was not. Where recordable, it becomes a voidable preference whenever the petition is filed, assuming the other elements of such a preference present. Where nonrecordable, it becomes such if the petition is filed within four months after it was made. Now, in either case, in determining whether the other elements are present, the transfer is always judged as of the date when made. This is so in the very nature of things. There is no other date as of which to judge it. So in case of a recordable transfer, which has been both made and recorded within four months of the filing of the petition, it must be judged as of the date of making, though another date, to wit, that of recording, is present. This is so because in such a case, the four months from the date of making not having expired, the prolonging words have no application. The case is just as if there were no such words in the section.

There are two reasons to account for the position of Judge Archbald and the appellate court of the Eighth circuit. One is that they are more or less antagonistic to the view that an actual intent to prefer on the debtor's part is an essential element of a voidable preference. They are inclined to see no more than objective elements in a voidable preference. This sticks out in the following quotation from the dissenting opinion of Judge Adams in the recent decision of that appellate court in the case of Powell v. Gate City Bank, 178 Fed. 609, 618, 102 C. C. A. 55, 64, to wit:

"Certain facts are incontrovertible. The Humes Company was then actually insolvent, and a preference was actually given to the bank. The only other fact requisite to constitute this a voidable preference, within the meaning of section 60b of the bankruptcy act, and to entitle the trustee to recover the amount thereof, is that the bank must have had at the time a reasonable cause to believe that the Humes Company intended a preference."

The transfer involved there was a payment, and the difference was as to the existence of reasonable cause for the creditor to believe that a preference was intended.

The other reason which may account for this position is that both Judge Archbald and the appellate court of the Eighth circuit were impressed with the thought that the bankrupt act, as it stood before it was amended, was defective in its suppressive features as to secret transfers in general, and the object of the amendment of 1903 of section 60a was to a certain extent to remedy this defect. As it then stood it suppressed only such transfers as were void under the state law, and then only in case the conditions necessary to their being void thereunder had come into existence. Sections 67a, 67b, covered this feature of the act. That they have held that a recordable transfer to secure a present debt, made when the debtor was amply solvent,

was a voidable preference, because, when recorded, the debt was then past and the debtor then insolvent, can be accounted for only on the ground that they thought the object of the amendment of 1903 of section 60a was to remedy the supposed deficiency in this feature of the act. It is apparent that they so thought from certain statements made by them. In the case of First National Bank of Buchanan County v. Connett, supra, Judge Hook, as quoted above, said:

"The amendment of 1903 was intended to remedy the evil resulting from secret instruments of transfer of the bankrupt's property, the withholding of them from record until shortly before the institution of bankruptcy proceedings, and the then assertion of them as of the prior date of their execution and delivery." ·

According to this the evil to be remedied was the withholding from record and subsequent assertion as of the date of making "secret instruments of transfer"; i. e., secret transfers generally, and not secret preferences. And again he said:

"Under the act of 1867, not only the question of requirement to record a chattel mortgage, but also the effect of noncompliance therewith, were ex-· clusively controlled by the law of the state. The same construction has been applied to the original act of 1898."

He referred to the amendment of 1903 of section 60a as a "departure from this construction in relation to voidable preferences," and as to the effect of giving the amendment the construction that recorded transfers should speak as of the date of recordation, and not of date of making, he said that:

"It would entail a consequence upon a failure to record that might not be imposed by the law of the state; but we deem it to be, not only within the letter of the amendment, but also within the intention, to correct an evil which flourished under the construction of the original act."

A striking illustration of this confusion in the Eighth circuit of secret preferences with secret instruments of transfer generally—i. e., · without reference to their particular character—is to be found in the ground of decision of McElvain v. Hardesty, supra. It was based on the holding that the transfer involved was suppressible by the application of the provisions of sections 60a, 60b, thereto. It might have been, and it seems should have been, based on the position that it was within sections 67a, 67b. The creditors represented by the trustee had all become such after the making of the transfer in question and before its recordation, and under the law of Missouri it was void as to such creditors, notwithstanding its ·subsequent recordation. This was the course pursued by the appellate court of the Eighth circuit in the subsequent cases of In re George Bothe, 173 Fed. 597, 97 C. C. A. 547, and Post v. Berry, 175 Fed. 564, 99 C. C. A. 186.

In the case of English v. Ross, Judge Archbald said:

"The only doubt I have is raised by those cases which apparently hold that the right of the trustee to question such a conveyance is to be determined by the state law and what there obtains. Thompson v. Fairbanks, 196 U. S. 516 [25 Sup. Ct. 306, 49 L. Ed. 577]; Humphrey v. Tatman, 198 U. S. 91 [25 Sup. Ct. 567, 49 L. Ed. 956]; In re N. Y. Economical Printing Co., 110 Fed. 514 [49 C. C. A. 133]; In re Shirley, 112 Fed. 301 [50 C. C. A. 252]. But all of these will be found on examination to have arisen prior to the

amendment of 1903, by which the clause with regard to recording was carried forward from the third section to the sixtieth, and do not assume to pass upon the act as it now stands. Neither do they consider the relation existing between the two sections named. Regarding them as in these respects distinguishable, I have ventured to follow what seems to me to be the natural and necessary construction to be given to this part of the act, upon which its efficiency in the matter of preferences in large measure depends."

If time were taken to run this matter down, I think it can be shown that the amendments of 1903 have had no effect whatever on cases of the character involved in the four cases referred to in the above quotation, and that cases of that character, arising since those amendments, have been decided as they were before, or rather were not regarded as being affected in any way by those amendments. Two recent cases to this effect are those of Sexton v. Kessler & Co., 172 Fed. 535, 97 C. C. A. 161, and In re Automobile Service Co., 176 Fed. 792.

Then, if at the time of the amendments of 1903 it was intended to make any change in the suppressive features of the bankrupt act as to secret transfers generally, it is strange that the sections covering those features were not amended so as to effect such change. That the amendments were limited to the preference sections shows that the evil intended to be cured was to bring recordable preferential transfers within the reach of the bankrupt court which, as the act stood before the amendment, were not because of the time that had elapsed from the time they were made until the petition was filed.

In combating the position that recorded transfers are to be judged as of date of record, and not as of date of making, in determining whether they are voidable preferences, I am not to be taken as thinking that delay in recording a recordable transfer is never of any significance in determining whether it is a voidable preference. It may be of significance in this particular. It may have an evidential significance. Possibly it may have in a given case a tendency to show that the debtor made the transfer with an actual intent to prefer, though, unless it is shown that he was a party in some way to its being withheld from record, I do not see how it can well have any such significance. Certainly, if it is shown that the debtor did have an intent to prefer, the fact that the creditor did not promptly place the transfer of record may have a tendency to show that he was conscious of the fact that it was tainted, because made with such intent and he participated in it. In Judge Archbald's article in the American Law Review seemingly he refers to the decision of the appellate court of the Sixth circuit in Loeser v. Savings Deposit Bank & Trust Co., supra, as approving his decision in English v. Ross that a recordable transfer is to be judged as of the date of recordation and not of the date of making. But it does not approve this decision. It did refer to the case with approval, but what it approved was the position it took as to the meaning of the words "if by law such recording or registering is required" by section 60a as amended in 1903—that they meant the same as if it had been provided "if by law such trans-

fer is recordable." Judge Lurton, in referring to English v. Ross, said:

"Judge Archbald, in English v. Ross, 140 Fed. 630, and the Circuit Court of Appeals for the Eighth Circuit, in First National Bank v. Connett, 142 Fed. 33 [73 C. C. A. 219, 5 L. R. A. (N. S.) 148], reached an opposite conclusion, and held that a recording statute, which required a conveyance or transfer to be recorded, to be effective against a certain class or classes of persons, was a law which 'required' the recording of the transfer in question within the meaning of section 60a as amended. With this conclusion we agree."

The question was not involved there as to whether a recorded transfer was to be judged as of date of record or as of date of making. And so far as it showed any leaning, it was towards the position that it was to be judged as of date of making. The mortgage involved there was made April 27, 1904. It was filed for record November 24, 1904, and the petition in bankruptcy was filed December 1, 1904, which was more than four months after the mortgage had been made. The case was tried on a stipulation by which it was agreed that the elements necessary to a voidable preference existed both when the mortgage was executed and when it was recorded. Judge Lurton referred to the significance of the amendment of 1903 in these words:

"The evil to be corrected was that of secret preferences, given by withholding from record instruments which by the whole policy of the recording statutes should be recorded. This evil was pointed out by the author of the amendatory act of 1903, and the object of the amendment of section 60a was stated to be the remedying of this evil. The law as it stood encouraged such secret liens and preferences; for, if they could be concealed for four months, though acts of bankruptcy, they were not voidable by the trustee."

This is in line with the position which I have taken above as to the object of the amendment. It was not to correct any evil due to having secret liens in general or secret instruments of transfer, as Judge Hook terms them in First National Bank of Buchanan County v. Connett, to the provisions of the state law, but to the evil due to allowing secret preferences, which might have been recorded, but were beyond attack from the time they were made, though they were acts of bankruptcy.

In considering the effect of the bankrupt act as it stood after the amendments of 1903 I have been dealing with it before the amendments of 1910 (Act June 25, 1910, c. 412, 36 Stat. 838), as this case arose under it as it stood after the former amendments and before the latter. One of the amendments of 1910 relates to section 60b. Thereby it is made to read as follows, to wit:

"If a bankrupt shall have procured or suffered a judgment to be rendered against him in favor of any person or have made a transfer of any of his property, and if, at the time of the transfer, or of the entry of the judgment, or of the recording or registering of the transfer, if by law recording or registering thereof is required. and being within four months before the filing of the petition in bankruptcy or after the filing thereof and before adjudication, the bankrupt be insolvent, and the judgment or transfer then operate as a preference, and the person receiving or to be benefited thereby or his agents acting therein shall then have reasonable cause to believe that the enforcement of such judgment or transfer would effect a preference, it shall be voidable by the trustee and he may recover the property or its value

from such person. And for the purpose of such recovery any court of bankruptcy, as herein defined, and any state court, which would have jurisdiction if bankruptcy had not intervened, shall have concurrent jurisdiction."

This amendment places judgment and transfer preferences on the same footing, eliminates from transfer preferences any subjective element, and makes them, where recordable and recorded, speak as of the date of recordation. This makes a radical change in the law, and may be regarded as a legislative recognition, to a certain extent at least, of the soundness of the position I have taken.

[3] In returning, then, from this general survey to this particular case, to a continuation of the narration of pertinent facts, and to a determination whether the deed in question here was a voidable preference, I bring with me the following matters as controlling in determining whether it is such a preference:

First. Was the deed made in part in satisfaction of a debt past at the time it was made, to wit, July 28, 1906?

Second. Was the bankrupt at that time insolvent?

Third. Did he make the deed with the actual intent of preferring Yates; i. e., did he have such intent when he made the deed?

Fourth. Did Yates at that time have reasonable cause to believe that it was so made?

In what I have already said is found an answer to the first of these four questions. The deed was made in part in satisfaction of a past debt. It must also be accepted that at that time the bankrupt was insolvent, as will appear more fully hereafter. The last two questions, then, are the vital ones in this case. Did the bankrupt make the deed to Yates with the intent of preferring him over his other creditors? And did Yates have reasonable cause for believing that it was so made? In determining these questions the deed is to be judged as of the date when it was made, and not as of the date it was recorded. This is not a case for the application of the doctrine which I have combated, even if it were sound in cases where applicable. Here the deed in question was made within four months before the filing of the petition. It is not a case, therefore, where the prolonging words of section 60a, added by the amendment of 1903, have any application. Of course, in judging the deed as of the date when made, the delay of Yates to record it may have some significance in determining whether it is a voidable preference. Given the intent to prefer on the part of the bankrupt, it may tend to show that Yates had reasonable cause to believe that it was made with such intent and was actually conscious of it.

The bankrupt, at the time of the making of the deed in question, to wit, July 28, 1906, was about 63 or 64 years of age. He lived at Louisa, Ky., in which the lot thereby transferred was located, a small city of about 1,500 inhabitants. He had lived there about 40 years. He was then, and had been for many years, actively engaged in business in the Big Sandy valley, in which Louisa is located. He was engaged in business on his own account, and managing the business of three different corporations, to wit, the Whitehouse Cannel Coal Company, heretofore referred to, the Torchlight Coal Company, and the Eloise Improvement Company. The business in which he was

personally engaged was that of farming, timbering, and buying and selling lands and minerals. The business of the Whitehouse Cannel Coal Company was that of coal mining, timbering, and merchandising, and of the Torchlight Coal Company mining, and possibly merchandising. The mines and lands of the former company were located at Whitehouse, about 30 miles above Louisa, on the Big Sandy river, and those of the latter company about .5 miles above. Their offices were probably in Louisa. It does not appear what the business of the Eloise Improvement Company was, or where its properties or place of business was located. The capital stock of the Whitehouse Company was $400,000, the bulk of which was owned by the bankrupt; that of the Torchlight Company was $50,000, one-half of which was owned by him; and that of the Eloise Company $60,000, of which $45,000 was owned by him. He was the treasurer and general superintendent of the one, chief officer of the second, and president of the other. He was so thoroughly identified with them, and they were so exclusively managed by him, that they were spoken of in the record' as his corporations or his companies. Of the three, the Whitehouse Company was the one of largest affairs and the one to which he was most attached. Its assets consisted of 3,200 or 3,400 acres of land in fee, and about 1,500 acres of minerals, with store buildings, miners' houses, complete coal mining plant, including tipples, screen, blacksmith shop, cars, rails, merchandise in store, and other personal property used in mining, such as mules, etc., and six miles of tramroad, band mill, locomotive, and cars, and houses, all used in connection with its timbering business. These assets, outside of merchandise in store, were covered by a mortgage in favor of John C. C. Mayo for $15,000, given in March, 1905. The record makes no showing as to the assets of either the Torchlight Company or the Eloise Company. In the spring of 1906 the mines of both companies were shut down on account of the low price of coal. Simultaneously therewith, the Whitehouse Company began extensive timber operations under a large contract, and was engaged in these operations November, 1906, at the time the bankrupt filed his petition in bankruptcy. Within the year before November, 1906, the six miles of tramroad and houses used in connection with the timber operations had been built, and the band mill, locomotive, and cars also so used had been bought. It carried in its store a stock of merchandise of the value of at least $5,000, and did through it a business of $25,000 to $30,000 annually. Whilst mining and marketing coal, the value of coal business done amounted to $5,-000 a month, or $60,000 a year. No showing is made by the record as to the amount of business done by the Torchlight or Eloise Companies. In 1904 and 1905 the volume of business done by the bankrupt was $150,000 annually. No showing is made by the record as to the amount of business done by him in 1906. There is no indication, however, that in 1906 there was any let-up in this. In either the year 1904 or 1905 the bankrupt companies did a business of $300,000 with the Big Sandy National Bank, with whom their banking business was transacted. The uncertainty as to the year is due to the fact that the bankrupt and Miller, his right-hand man, differ in their testimony as to the year when the bank protested certain papers, to be referred

to more particularly hereafter, and it was the year previous to the protesting that the amount of business was so transacted. The bankrupt testifies that this protesting was in May, 1905, and Miller that it was in May, 1906. These figures, which is all the record presents along this line, show that the business transactions in which the bankrupt was engaged on account of himself and companies were very extensive—so extensive, indeed, that the wonder is how one man could look after them all.

The bankrupt did not have enough capital to carry on these several businesses with ease. Indeed, he seems all the time to have been hard up for ready money. It was a continual struggle on his part to raise money to meet current obligations. He had to obtain indulgences and extensions of time from his creditors, and it required very able financiering to keep things moving or going. Long before he filed his petition in bankruptcy, which was on November 17, 1906, he and each of his companies became insolvent within the meaning of the act of 1867 —i. e., inability to meet current obligations as they matured—and he and they were subjected to a rain of suits in the Lawrence circuit court, which resulted in judgments, and some of them in executions and levies thereunder. The suits began as early as before March 1, 1905. On that date a judgment was obtained against the Whitehouse Cannel Coal Company for $360.75, and one against the Torchlight Company of $347. On June 6, 1905, a judgment was obtained against him for $1,000 and interest. On October 31, 1905, a judgment was obtained against him for $504.18, two against the Whitehouse Company, one of which was for $336.08, the amount of the other not being given, and one against the Eloise Company for $437.12. On February 27, 1906, two judgments were obtained against the Torchlight Company, one for $316.18 and $315.55, and the other for $393.91. On February 28, 1906, a judgment was obtained against the Whitehouse Company for $413.50, and on March 1, 1906, another one against the same company for $835.95. On June 7, 1906, two judgments were obtained against the Whitehouse Company, one for $284, and the other for $407.18, and one against the Eloise Company for $168.95. On June 8, 1906, a judgment was obtained against him for $1,000, credited by $334.14, and one for $1,932. On September 14, 1906, a judgment was obtained against him for $750. On September 22, 1906, two judgments were obtained against the Whitehouse Company, one for $1,250, and the other for $250. On September 25, 1906, a judgment was obtained against him for $3,318. And on November 9, 1906, a judgment was obtained against the Whitehouse Company for $372.54.

The bankrupt stood up under this heavy pressure, and paid or replevied each one of these judgments, except that of September 25, 1906, for $3,318. On only two of those that were paid were executions issued and levied—that of June 6, 1905, against him for $1,000, known as the "Loar judgment," and that of June 8, 1906, for $1,000, subject to said credits, known as "First National Bank of Louisa judgment." There was no sale under levy, as I gather it. The judgment of September 14, 1906, for $750, known as the "McCoy judgment," was for a purchase-money lien, put in suit at bankrupt's instance to

settle ownership, and after it was rendered the property covered by it was sold privately, and out of the proceeds ($2,000) the purchase-money lien, a balance due on the Loar judgment, and First National Bank judgment were satisfied. There is no indication that the bankrupt took umbrage at any of these suits, judgments in which he then satisfied. So far as they were against his companies, they seem to have been for merchandise sold.

The suit in which the judgment for $3,318 was rendered was brought in January, 1906. The note on which it was based was secured by the personal indorsement of a citizen of Louisa, then dead. There is some indication that the matter of his liability was questioned by his personal representative, and possibly the delay in obtaining judgment was caused by this. If so, there is no indication of how this matter resulted. When the judgment was obtained, it was pushed against the bankrupt. Execution was issued and levied in October, 1906, and sale advertised for Monday, November 19, 1906. On November 12, 1906, the bankrupt requested the judgment creditor for further time. He refused to grant it. The bankrupt then made arrangement to raise enough money on some property owned by him to satisfy the judgment and give him a surplus. Some of his largest creditors objected to his paying this judgment, and one told him that if he allowed the sale to be made it would be an act of bankruptcy. Until November 16, 1906, he expected and hoped to adjust this claim. And on Saturday, November 17, 1906, he filed his petition in bankruptcy.

The bankrupt did take umbrage at the pressure of this claim. He seems to have thought at the time that it was unnecessary, and if it had not been pressed he would have been able to weather the storm. The only other creditor concerning whose course he took umbrage was that of the Big Sandy National Bank, with whom he did his banking business. What he complained of was its refusal to renew obligations of his companies on which he was indorser and allowing same to go to protest. The obligations of the Whitehouse Company amounted to $4,000, of the Torchlight Company to $4,000, and of the Eloise Company $5,000, or $13,000 in all. By referring to the schedule of the Whitehouse Company in the record, I find that this incident took place in May, 1906, and not in May, 1905, so that the testimony of Miller as to the matter was correct, and the $300,000 of business done with this bank was in 1905. Though the bank refused to renew, it did not push the collection of its paper. It accepted the interest on it, which the bankrupt kept paid up until his bankruptcy. This action on the part of the bank, which led to his transferring his account elsewhere, affected his credit, and it was because of this the bankrupt took umbrage. It added difficulty to his raising money in order to proceed. All the other obligations of himself and companies he kept renewed, and at the time of his bankruptcy same had been renewed past the date thereof.

Thus far I have had nothing to say as to the solvency of the bankrupt and his companies, according to the definition of insolvency under the present act. By it one is insolvent if his property, exclusive

of that fraudulently conveyed, will not pay his debts. There had been no fraudulent conveyance here, so the question as to whether the bankrupt and his companies were solvent depends on whether their properties exceeded their debts. I think it must be accepted as a fact beyond question that the bankrupt and each of his companies were insolvent when he made the transfer of the lot in question to Yates, and it is likely such had been the fact for several years before then. It was certainly the fact as to the bankrupt. The only comparison of assets and liabilities which the record presents is between the liabilities as they existed at the filing of the petitions in bankruptcy (it should be stated that shortly after the bankrupt filed his petition, to wit, towards the end of November, 1906, each of his companies was thrown into bankruptcy by involuntary proceedings instituted against it) and the proceeds realized from their respective properties in the bankruptcy proceedings. The showing thus made is quite adverse to the bankrupt and his companies. Thus the bankrupt's scheduled liabilities were $238,956.37, and the amount realized from his assets was $21,699.96. The assets were scheduled at $129,945.98. These did not include any value placed on his stock in his companies, but did include $82,801.71 indebtedness on part of the companies to him, of which $15,391.72 was due from the Whitehouse Company, $14,746.27 from the Torchlight Company, and $52,663.72 from the Eloise Company, leaving 47,144.27 represented by other assets, the main item of which was real estate, put at $34,175. This showing may be toned down somewhat in its bearing on the bankrupt's intent in making the transfer to Yates. Of the liabilities, $113,798.18 was due the Cincinnati Cooperage Company on account of advances made in 1899 and 1900 to buy staves and ties. In those years the bankrupt lost at least $100,000 by unusual floods in the Big Sandy river, carrying away staves and ties so purchased. Thereafter that company had not pushed its claim against the bankrupt, and had a standing offer with him to take $15,000, reduced in 1906 to as low as possibly $10,000, in satisfaction of its claim. Amongst other liabilities not pressing him was an indebtedness to his son-in-law, Charles Russell, of $16,100, and two Rowe debts, amounting to $10,000 each, or $20,000 in all. Of the balance of the liabilities, to wit, $89,158.19, he owed on account of indorsement for his several companies the sum of $68,539.49, of which $27,887.72 was on account of the Whitehouse Company, $18,022.15 on account of the Torchlight Company, and $22,627.02 on account of the Eloise Company, leaving a balance of $20,621.70 as the outside limit of his own individual indebtedness that could have been pressing him.

The showing thus made by the several companies was this: The total amount of scheduled liabilities of the Whitehouse Company was $73,397.59, of which $15,391.72 was due the bankrupt. There was realized from its assets the sum of $21,727.57. According to the schedule the assets amounted to $72,374.56. The total amount of scheduled liabilities of the Torchlight Company was $39,569.80, of which $14,746.27 was due the bankrupt. There was realized the sum of $11,469.94 from its assets. I have not the amount of assets ac-

cording to schedule before me. The total amount of scheduled liabilities of the Eloise Company was $80,136.47, of which $52,663.72 was due the bankrupt. The amount realized from its assets is uncertain, because in the stipulation the amount is stated to be $19,-944.78; but it is also stated that the creditors of that company received a dividend of 62 per cent. I cannot reconcile these two statements. To pay a dividend of 62 per cent. on $80,136.47, a much larger sum than $19,944 must have been realized from its assets.

It is to be noted that the amounts realized from the assets of the bankrupt and of the Whitehouse Company fell far short of the amount at which they were scheduled. I have no means of telling whether the same was the case as to the Torchlight and Eloise Companies. It is quite likely that it was. Nor does the record present any explanation of how it happened the assets came so far short of the amount at which they were scheduled. It is possible that, notwithstanding they realized no more, they may have been worth at a fair valuation on July 28, 1906, much more. It is a matter of common knowledge that the panic of 1907, which followed shortly after the bankrupt and his companies went into bankruptcy, affected the value of such properties very seriously, and it is possible that this failure of said assets to realize anything like the amount at which they were scheduled was due to this circumstance. It is therefore not unlikely that the financial condition of the bankrupt and his companies on July 28, 1906, valuing their properties at what they were then fairly worth, was much better than this comparison of scheduled liabilities with amounts realized from assets makes out.

The bankrupt testified that he believed that he was solvent up to the time he was forced to take the bankrupt law, and that from the time the Whitehouse Company in 1904 purchased the stock of goods from Yates until then he thought it abundantly able to take care of its obligations. And Miller, who was as familiar with the bankrupt's affairs as the bankrupt himself, testified that he did not think that the Whitehouse Company was ever insolvent at any time, and that what made the bankrupt insolvent was putting the indebtedness of the Cincinnati Cooperage Company, for which they were willing to take so small a sum, at par. What is against these two opinions is the comparatively small turnout through the bankruptcy proceedings as compared with the liabilities. There is nothing else. I cannot say that these opinions are not sincere. But I cannot see how it is possible for them to be correct. Of course, according to face values the bankrupt was solvent, even including the Cincinnati Cooperage claim. But according to real values it seems to me that the bankrupt must have been insolvent, even with that claim left out entirely. The only thing against this is the possibility that the panic of 1907 and the method of realization on the assets of himself and companies brought about a substantial shrinkage in values. I feel bound, therefore, to dispose of this case on the basis that the bankrupt and each of his companies was insolvent at the time of the transfer in question.

There is, however, another fact that must be accepted and taken into consideration, and that is that the bankrupt was gradually reduc-

ing his indebtedness each year.   He so testified, and there is nothing in the record to the contrary.   His testimony was that he was reducing his indebtedness as much as $15,000 to $18,000 a year.

Taking into consideration this circumstance, the fact that he took umbrage at the action of the Big Sandy National Bank in protesting his paper, thereby affecting his credit, and at the action of the judgment creditor who forced him into bankruptcy, the fact that he was able to and did get out of the way the 19 judgments that came upon him and his companies, the fact that he kept his and their paper, outside of that held by the Big Sandy Bank, renewed, and that he kept the interest on that paid up, convinces me that, though he may have realized his insolvency, he felt able to overcome adverse conditions, and was determined to do so.   The panic of 1907 was ahead of him, and would no doubt in the end have floored him.   Possibly his troubles in 1905 and 1906 were symptoms that it was on the road; but he did not so interpret them, and he kept pegging away.   His attitude towards his creditors to the end was that of the 'servants in the parable of the unmerciful servant, as expressed in each one's plea:

"Have patience and I will pay thee all."

I do not overlook the fact that in a circular letter which the bankrupt mailed to his creditors on the day he filed his petition he used these words:

"I have struggled faithfully all these years since, and have never lost hope until this year."

"This year" is indefinite, and may have included the date of the transfer.   In his testimony, however, the bankrupt said that the statement of his letter as to loss of hope was not true 10 days before he filed his petition, and the facts and circumstances to which I have alluded bear this out.

It is time, now, to leave this branch of the case and consider how it was the bankrupt came to make the transfer.   Both he and Yates have testified in regard thereto.   Yates was 35 or 36 years old, and engaged in the business of selling life insurance and buying and selling real estate.   As stated, he was a director in the Louisa National Bank. He had lived in Louisa and had been known by the bankrupt all his life.   They were friends, but there was no special intimacy between them.   He had had this one business transaction, to wit, the sale of the stock of goods to the Whitehouse Company, with the bankrupt.   The Louisa National Bank seems not to have favored the bankrupt much.   At the time of the bankruptcy the only obligation of his, or of either of his companies, held by it, was a note of the Torchlight Company with him as indorser for $1,000.   When he quit doing business with the Big Sandy National Bank, he transferred his account to the First National Bank of Louisa, and continued it there until his bankruptcy.

In May, 1905, Yates conceived the notion of buying the lot in question.   There was a rumor abroad that a bridge was to be built across the two forks of the Big Sandy river at the foot of Madison street, on which this lot was located, and he thought that the building thereof

would add to its value, and otherwise it was a desirable lot. Its purchase would be in the line of business. He thereupon opened negotiations with the bankrupt for its purchase. The latter asked $1,500 for it. He offered $1,250. According to his testimony, he then had no thought of applying the note of the Whitehouse Company on which the bankrupt was indorser, then in the Louisa National Bank, on the purchase price, but expected to pay in cash. The bankrupt then proposed that if he would pay $1,500 he would allow the note as a credit on the purchase price, the balance to be paid in cash. All this covered several days and several interviews. He took this proposition under advisement. Thereafter the bankrupt had an offer of $1,500 from another party, and thereupon, to wit, on May 29, 1905, he wrote Yates this letter:

"Louisa, Ky., May 29, 1905.

"F. H. Yates, Esq.—Dear Sir: I had expected to see you this a. m. before I went away and speak to you about the renewal of the note which Mr. Hays will bring down. With reference to the lot or lots by the post office, the 78 feet at $1,500, a party has been to see me that will take them as I understand; but I told him I could not give a positive answer until I had given you the opportunity to say 'Yes' or 'No.' So leave a note for me at your office.

"Yours truly,                                              Jay H. Northrup."

After consulting with the cashier of the Louisa National Bank and thinking the matter over, he concluded to accept, and then wrote the bankrupt this letter:

"Col. Jay H. Northrup—My Dear Sir and Friend: I have concluded to take the lots at the price of $1,500 as proposed by you, and I will take up the note when due, or now, if you wish it, and pay you the difference. I would rather take it up, however, at maturity.

"Very resp. yours,                                           F. H. Yates.
"June 13, 1905."

Thereby a binding contract was closed for the purchase of the lot. This was over a year before the deed was made. The purchase came about through no effort on Yates' part to get the Whitehouse Company note paid. It came about by a desire on his part to acquire the lot as a speculation. It was the bankrupt who suggested application of the purchase price in part in satisfaction of the note, and he did so by way of inducing Yates to give him the price asked. The price is referred to as a good round price, but there is no evidence that it was excessive. So far as the evidence goes, it is to the effect that the lot was worth the money. According to the testimony of the bankrupt, what induced him to make the sale was that the lot was yielding him no income, and thereby he was enabled to turn it in on reducing his indebtedness at a good figure. It was in pursuance of a plan on his part to make disposition of such properties as yielded him no profit or income, whenever opportunity afforded or he could bring it about, and thus reduce his indebtedness. At the time of the sale but three only of the judgments above referred to had been obtained, two on March 1, 1905, one against the Whitehouse Company and the other against the Torchlight Company, and one on June 6, 1905, the Loar judgment against him, on which, after the purchase, an execution issued and was

levied, and which was fully satisfied in the course of a year or so afterwards. No obligations had then been protested, and the bankrupt had not been subjected to any great amount of pressure by the creditors of himself and companies. At once upon the purchase Yates was placed in possession, but deed was not made until over a year later, to wit, on July 28, 1906.

The cause of the delay was due to the fact that the mental condition of the bankrupt's wife was not good, and that she was unwilling to sign the deed. She was unwilling, because she had furnished the money with which the lot was purchased, and always claimed it as hers. The bankrupt reasoned with her from time to time to get her to unite with him in a deed, but failed to get her to do so. Finally one of their children argued with her that, although her money went into the property originally, she would not be able to hold it, as the deed had not been made to her, and urged her to unite in the deed, and she consented. Then it was that the deed was executed and delivered. During all this time Yates had possession of the lot. He first used it as a pasture lot for his son's pony, and then as a garden. Inasmuch as he had not been able to make Yates a deed, the bankrupt continued to pay the discount on the note in the Louisa National Bank at the subsequent renewals the same as before. There is some evidence bearing on the question as to when Yates began to assess the property for taxation; but I cannot make out from it what was the fact in regard thereto. A. J. Garred, an attorney of Louisa, who had the Loar judgment in his hands, testified that, a few days after June 13, 1905, when he was seeing about its levy, Yates told him, in answer to a question as to whether he had purchased the lot, which was rumored, that he had not. Yates testified that he told him that he had, but that he had not obtained a deed. It is likely that Garred misunderstood what he said, and this accounts for the difference in their testimony. It is significant that he caused the execution to be levied on some lumber and slate piled on the lot, which was the property of the bankrupt, and on other real estate, but not on this lot. I think the testimony of Yates and the bankrupt as to their dealings with reference to this lot and how it was purchased must be accepted as true, and the case disposed of on that basis.

The bankrupt had nothing to do with the deed not being recorded as soon as executed and delivered, and did not know prior to his bankruptcy that it had not been so recorded. Yates' account of the delay in recording was that it was neglect on his part, that he put it in his safe, and afterwards had some other deeds to be recorded, and took them all to the office at the same time. Possibly it is of some significance that the deed was lodged for record shortly after Yates paid off the bank note and paid to Conley the balance of the consideration. This happened October 24, 1906, and the deed was lodged for record October 29, 1906.

It is now time to come to close quarters. Did the bankrupt make the transfer to Yates with intent to prefer him over his other creditors? I will decide this question on the basis, not only that the bankrupt was insolvent July 28, 1906, but that he realized his insolvency, and not only that both these things were true, but that they were true

in May and June, 1905, when the lot was sold to Yates. I do not say what is the real fact as to this, because it is unnecessary. I simply dispose of the case on this assumption.

But, though this may have been so, the bankrupt was substantially reducing his indebtedness each year. He had determined not to give up, and was confident of his ability to pull through if his creditors would allow him to keep going. And so far as they were aware of his condition his creditors acquiesced in his position. Certainly such was the position of his larger creditors, such as the Cincinnati Cooperage Company, his son-in-law, and the holders of the Rowe claims. His attitude towards his creditors was that of paying them all, in full, except possibly the Cooperage Company, whose proposition he expected to accept as soon as he could get in condition. He had nothing else in contemplation. And he was not only hopeful, but confident, of his ability to bring this about.

The bankrupt has testified that in making the transfer he had no intent to prefer Yates over other creditors. Judge Archbald, in the article heretofore quoted from, says that, on the basis that an actual intent on the part of the bankrupt to prefer is an essential element of a voidable preference, a denial by him that he had such an intent requires that the jury be instructed to find for the defendant if they believe the bankrupt. In this case I believe the bankrupt's denial of an intent to prefer. There is no circumstance in the case, beyond his insolvency and possible realization thereof, against it. Supporting it is the fact that he kept actually at work, without any let-up because of this condition of things, and was annually reducing his indebtedness to a substantial degree, and that he was hopeful and confident of his ability to pay out, and the record does not establish that this was unreasonable, or due to his shutting his eyes to conditions. There is not the slightest evidence that he ever thought of disposing of any of his property to the disparagement of any of his creditors. Possibly there were certain equities in the matter of his indebtedness to the Cooperage Company that were calculated to induce him to accept its proposition, and because of them he was willing to do this. It had advanced him money with the knowledge that it was to be invested in a hazardous business, and it is possible that the loss came about through no fault on his part. He made no fraudulent disposition of any of his property. It is not claimed that he attempted to prefer any other creditor. If he had a design to disparage his creditors generally, why should he pick out Yates for that purpose and limit himself to him? He and his bank had done him no special favors. Why should he not pick out his son-in-law, Russell? And why should he pick out property that his wife thought was hers, and get her to release her potential right of dower, to which no creditor had a claim?

Then, besides these considerations, the transfer did not come about in the way in which voidable preferences usually come about. Yates was not pressing the payment of the bank note. He did not have in view the payment of that note as the result of the purchase of the lot by him. The desire to purchase was for speculative purposes. And the suggestion of the payment of the note came from the bankrupt as a means of lifting Yates to his price.

I am therefore constrained to hold that the transfer was not made with an intent to prefer on the part of the bankrupt. In so holding, I judge of it as of the date when it was made; i. e., July 28, 1906. I do not know that the holding would be otherwise if it were judged as of the date of recordation, to wit, October, 1906. It was not until after that that the bankrupt came to realize that it was impossible for him to proceed further. But really there is reason for the position that it should be judged as of the date when the sale was made, in May and June, 1905. There was a binding contract of sale then entered into. Had the consideration been a cash payment then made, and had no deed been made before bankruptcy, Yates would have been entitled to a deed as against the trustee. In re Sewell, 111 Fed. 791; York Mfg. Co. v. Cassell, 201 U. S. 345, 26 Sup. Ct. 481, 50 L. Ed. 782: Crucible Steel Co. v. Holt, 174 Fed. 127, 98 C. C. A. 101.

It is hard to see why the same result would not have followed with the consideration, as it actually was, had there been no intent to prefer on the part of the bankrupt in the making of the contract. If so, then the transfer should be judged as of the date of the contract, and not as of the date of its performance by the execution and delivery of the deed. I do not, however, find it necessary to base the case on this position.

There being then no intent to prefer on the part of the bankrupt at the time of the transfer, July 28, 1906, it is not necessary to go into the question whether at that time Yates had reasonable cause to believe that it was made with such intent. Yates knew of the Loar judgment and its levy shortly after his purchase. There is no evidence in the record tracing to him knowledge of any of the other suits and judgments against the bankrupt and his companies. He denies such knowledge. There is room, however, to say that it is not likely that he did not hear something about at least some of them. But it is to be noted that his bank continued to credit one of the bankrupt's companies with the bankrupt as indorser and to renew the paper. And, there having been no intent to prefer, I am constrained to hold that Yates had no reasonable ground to believe that there was such an intent. It is perhaps sufficient to say that, as has been held, the burden was upon the plaintiff to establish the intent to prefer and the reasonable cause to believe, and it has failed to sustain this burden. Possibly it is a correct diagnosis of the bankrupt's case to say that he was jealous of his commercial standing and loath to surrender it, and that this led him to hold on after he should have recognized the inevitable and turned over his assets for distribution equally amongst his creditors. It is not necessary for me to take a position as to this. All I will say is that, if this be a correct diagnosis, it cannot be said that this condition had arisen as early as July 28, 1906, the date of the deed, certainly not as early as the execution of the written contract therefor by the correspondence which passed in May and June, 1905.

The bill is therefore dismissed.